# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

|  |  |
|---|---|
| **IN RE APPLICATION OF ILAN SHOR FOR AN ORDER DIRECTING DISCOVERY FROM MATEI DOHOTARU PURSUANT TO 28 U.S.C. § 1782** | Case No. 1:23-mc-12 |

## ILAN SHOR'S MOTION FOR DISCOVERY
## IN AID OF A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. § 1782

1.      Pursuant to 28 U.S.C. § 1782, and based upon the concurrently filed Memorandum of Law (the "Memorandum"), the Declaration of Aureliu Colenco ("Colenco Decl."), the Declaration of Shaul Brazil (and accompanying exhibits) ("Brazil Decl."), and the Declaration of Amelia J. Schmidt, Mr. Ilan Shor respectfully requests that this Court grant his petition for discovery in aid of a foreign proceeding and issue the proposed Order submitted herewith, which grants Mr. Shor leave to serve subpoenas seeking testimony and document discovery from Mr. Matei Dohotaru.[1]

2.      As set forth in the Memorandum, courts regularly grant applications for discovery under 28 U.S.C. § 1782 on an *ex parte* basis.

3.      For the reasons set forth in the accompany Memorandum of Law, and any others this Court may deem proper, the Court should grant the Petition and enter an Order allowing Petitioner to serve the subpoenas annexed to this Petition on Mr. Dohotaru. A proposed Order is attached.

---

[1] Mr. Shor previously submitted an application for the same relief on October 25, 2022. *Shor v. Dohotaru*, 22-mc-27, ECF No. 1. Mr. Shor's counsel subsequently withdrew, and delay in obtaining new counsel required him to withdraw the prior application with leave to refile. *Shor*, 22-mc-27, ECF No. 16 (Mar. 21, 2023).

Dated: June 16, 2023

Respectfully submitted,

*/s/ Christopher Muha*
Christopher Muha
    Virginia Bar No. 89751
Matt Kaiser*
    D.C. Bar No. 486272
Amelia J. Schmidt*
    D.C. Bar No. 1012380
KAISERDILLON PLLC
1099 14th Street NW
8th Floor West
Washington, DC  20005
Telephone: 1 (202) 640-2850
Facsimile: 1 (202) 280-1034
**Pro hac vice* petition to be filed

*Counsel for Petitioner Ilan Shor*

**MOTION EXHIBIT 1_PAGE_002**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**IN RE APPLICATION OF ILAN SHOR
FOR AN ORDER DIRECTING
DISCOVERY FROM MATEI DOHOTARU
PURSUANT TO 28 U.S.C. § 1782**

Case No. _____

**DECLARATION OF SHAUL BRAZIL IN SUPPORT OF
ILAN SHOR'S PETITION FOR DISCOVERY
IN AID OF A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. § 1782**

Shaul Brazil hereby declares, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of his knowledge, information and belief:

1.  I am a partner at the law firm BCL Solicitors LLP in London, United Kingdom. I have personal knowledge of the information provided in this Declaration, except where I note that certain information has been communicated to me by others. All of the information stated herein is true to the best of my knowledge and belief.

2.  I am advised and understand that this Declaration will be submitted with a Petition for Discovery in Aid of a Foreign Proceeding pursuant to 28 U.S.C. § 1782 ("**the Petition**"), and that the Petition will be submitted to a United States Court on behalf of Mr. Ilan Shor. I am further advised and understand that the Petition will ask the United States Court to compel the production of documents and testimony from Mr. Matei Dohotaru.

3.  Since approximately November 2022, I have been instructed to act as legal counsel for Mr. Shor. On 22 December 2022, Mr. John Binns (my partner at BCL Solicitors LLP) and I were admitted to the Registry of Foreign Lawyers of the Republic of Moldova for the purpose of assisting Mr. Shor's Moldovan lead counsel, Mr. Aureliu Colenco, in pending judicial proceedings in Moldova in which Mr. Shor is a criminal defendant. It is for use in the above proceedings that Mr. Shor now seeks this discovery.

**MOTION EXHIBIT 1_PAGE_003**

*Criminal proceedings against Mr. Shor in Moldova*

4.  Mr. Shor is a prominent businessman and politician. He is the leader of the Șor Party, a minority, opposition political party in Moldova. He is the former Mayor of the city of Orhei, and he currently serves as a member of the Moldovan Parliament.

5.  The proceedings arise from alleged fraud at three Moldovan banks. In 2014, Mr. Shor accepted an appointment as Chairman of the Board of one of Moldova's largest banks, Banca de Economii. Several months later, the National Bank of Moldova ("**NBM**"), which exercises regulatory authority over Moldova's banking system, placed Banca de Economii, together with two other major Moldovan banks, Unibank, S.A. and Banca Sociala, S.A. (collectively, the "**Moldovan Banks**"), under temporary administration due to insufficient liquidity.

6.  In 2016, the Moldovan Anti-Corruption Prosecutor's Office charged Mr. Shor with criminal fraud and money laundering in connection with the collapse of the Moldovan Banks. In June 2017, the court of first instance—the Chisinau Court, Buiucani Division—issued its judgment (the "**Judgment**"). The Judgment acquitted Mr. Shor of fraud but found him guilty of the lesser offense of causing material damage through deception or abuse of trust, as well as money laundering. *See* Judgment dated June 21, 2017 of the Chisinau Court, Buiucani Division against Mr. Ilan Shor at § 42 (excerpts, along with certified translations, are attached as Exhibit A hereto).

7.  On July 28, 2017, the Anti-Corruption Prosecutor's Office commenced an appeal of that part of the judgment acquitting Mr. Shor, as well as of the sentence. Whereas the Chisinau Court sentenced Mr. Shor to seven years and six months in prison, prosecutors sought an increased sentence of nineteen years. *See* Prosecutor's Petition for Appeal dated July 28, 2017 at §165 – 167 (excerpts, along with certified translations, are attached as Exhibit B hereto).

8.  On July 31, 2017, Mr. Shor's defense commenced an appeal of that part of the judgment finding him guilty. As explained by Mr. Colenco in his Declaration, the appeal proceedings entail full evidentiary proceedings, where the Court of Appeal reconsiders the evidence presented to the court of first instance *de novo*, as well as any new

2

**MOTION EXHIBIT 1_PAGE_004**

exculpatory evidence presented by the defense. Indeed, under Moldovan law, a criminal defendant can present new exculpatory evidence at any time—even after the proceedings have concluded.

9. In the court of first instance, Mr. Dohotaru was a key witness for the prosecution. However, after Mr. Dohotaru provided his testimony in the court of first instance in June 2017, he left Moldova for the United States. The Moldovan prosecutors—while apparently agreeing that Mr. Dohotaru is a critically important witness—took the position that Mr. Dohotaru could not be examined in the evidentiary proceedings before the Court of Appeal in Moldova, given that he currently resides in the United States.

10. As indicated above, I have directly been involved in the appeal proceedings before the Chisinau Court of Appeal since 22 December 2022.

11. On 18 January 2023, I applied to the Chisinau Court of Appeal for an adjournment of the proceedings for two months. That period was considered necessary and reasonable to provide sufficient time to review the case file and to be able meaningfully to provide assistance in the preparation of Mr. Shor's defence. In response to my request, the Court granted an adjournment of three weeks, to 13 February 2023.

12. This is a highly complex case. The proceedings before the Chisinau Court of Appeal had been ongoing since they were transferred from the Cahul Court of Appeal in August 2021. During the course of the proceedings a large volume of evidence and many witnesses had been heard, and numerous applications by both the defence and the prosecution had been made and determined. In the time available, I had not been able to apprise myself fully with the case file, which comprised 47 volumes of material, the vast majority of which is in the Romanian language. This exercise was further hampered by the Court's refusal on 7 February 2023 to grant us access to the minutes of the proceedings until after the conclusion of the proceedings.

13. Against that backdrop, at a hearing on 20 February 2023, I applied to the Court for a further adjournment of the case for two months. That application was refused.

**MOTION EXHIBIT 1_PAGE_005**

14. At a hearing on 10 March 2023, I applied to the Court for additional time to be granted for the purposes of pursuing the Petition and obtaining Mr. Dohotaru's testimony. That application was also refused. Further, on the same day, the Court declared that the judicial inquiry (the evidential stage of the proceedings) had been completed and directed that closing submissions would be made on April 12, 2023.

15. Following the conclusion of closing submissions on April 13, 2023, the Court immediately retired and – within hours - issued a final judgment, rejecting Mr. Shor's appeal as unfounded (and/ or issued out of time) and admitting the prosecution's appeal, thereby finding Mr. Shor guilty of fraud and money laundering. Mr. Shor was sentenced to 15 years' imprisonment. The Court's written judgment, the "reasoned decision", was handed down on May 30, 2023. A professional English translation has not yet been obtained as the judgment is approximately 200 pages.

16. Notwithstanding the fact that the Court of Appeal proceedings have now concluded, Mr. Dohotaru's testimony remains of critical importance to Mr. Shor's defense and can still be used in the pending criminal proceedings against him.

17. Although it is my submission that Mr. Shor did not receive a fair trial in Moldova, it is nonetheless the defence's intention to exhaust all available domestic remedies. Specifically, and as indicated by Mr. Colenco in his Declaration, on or prior to June 30, 2023 (that is, within the statutory period of 30 days from the anticipated date of the pronouncement of the reasoned decision), Moldovan counsel will be commencing a cassation appeal with the Moldovan Court of Cassation, which constitutes the domestic court of last instance.

18. I am informed by Mr. Shor's Moldovan counsel that although the Court of Cassation rules primarily on matters of law, fresh evidence may still be introduced if that evidence was not known to the defendant, or the defendant did not have access to the evidence before the Court of Appeal issued its verdict.

19. Further, should the outcome of the cassation proceedings be unfavourable to Mr. Shor, we intend to file an application with the European Court of Human Rights ("**the ECtHR**") challenging the violations of Mr. Shor's fundamental rights under the

4

**MOTION EXHIBIT 1_PAGE_006**

European Convention on Human Rights ("**the Convention**") that have occurred throughout the course of the criminal proceedings against him in Moldova.

20. The violations that have occurred to date include the improper reliance on Mr. Dohotaru's evidence in the Court of Appeal in circumstances where Mr. Shor was deprived of the opportunity to cross-examine him. If the evidence obtained from Mr. Dohotaru pursuant to the Petition undermines the prosecution case or supports the defence case—as we anticipate it will—and the Court of Cassation declines improperly to admit it or take it into account, we will adduce this further violation before the ECtHR.

### *The Testimony of Mr. Dohotaru*

21. Mr. Dohotaru was the key witness for the prosecution against Mr. Shor in the court of first instance. Mr. Dohotaru once held a high-ranking supervisory position at NBM. As Mr. Colenco sets out:

> *The court of first instance rested its guilty verdict largely on Mr. Dohotaru's testimony, which is contested by Mr. Shor in numerous key respects. Among other things, Mr. Dohotaru alleged in his witness statement that companies connected to Mr. Shor were involved in fictitious banking transactions to conceal bank fraud, allegations the court of first instance accepted... Mr. Shor, at both the court of first instance and his appeals, has contested the factual basis for Mr. Dohotaru's statements and Mr. Dohotaru's credibility as a witness.*

22. Among other things, Mr Dohotaru alleged that companies connected to Mr. Shor were involved in fictitious banking transactions to conceal bank fraud, allegations the court of first instance accepted. Mr. Shor, at both the court of first instance and the Court of Appeal, has contested the factual basis for Mr Dohotaru's statements and Mr Dohotaru's credibility as a witness.

23. Notably, at the time of the first trial, NBM had commissioned Kroll, the investigative firm, to prepare a "preliminary scoping report," which was not admitted into evidence at trial, but which was leaked to the press in May 2015 by Mr. Andrian Candu—then

5

**MOTION EXHIBIT 1_PAGE_007**

the Speaker of the Moldova's Parliament—and on which the Prosecutor's Office reportedly based much of its case against Mr. Shor. According to the Judgment's description of Mr. Dohotaru's testimony, he based his testimony against Mr. Shor in significant part on "*reports presented by the Kroll company, [from which] the involvement of Ilan Sor is confirmed in the relevant fraud.*"[1] *See* Judgment at § 42.

24. This is despite the fact that the Kroll report expressly provides:

> "*This Report does not constitute a recommendation, endorsement, opinion or approval of any kind with respect to any transaction, decision or evaluation, and **should not be relied upon as such under any circumstances**.*"

> "*Statements herein concerning financial, regulatory or legal matters should be understood to be general observations based solely on Kroll's experience as risk consultants and **may not be relied upon as financial, regulatory or legal advice which Kroll is not authorized to provide**.*"[2]

25. Indeed, notwithstanding Mr. Dohotaru's (and therefore, indirectly, the court of first instance's) reliance on the Kroll report, it is evident that the report is based on a single source – information, analysis and data provided exclusively by the NBM without any independent verification of their source and veracity[3]:

> "*In conducting this preliminary scoping phase of investigation, **Kroll has relied upon information and analysis conducted by the NBM**, in order to conduct an assessment of the basis of their findings to date, and concerns raised.*"

---

[1] Kroll prepared two additional reports in 2017 and 2018—after Mr. Dohotaru gave his testimony at the first instance trial—one of which was apparently released to the public online and is now a matter of public record. Notwithstanding the reference in the Judgment to "Kroll reports" in the plural, we are aware of only one Kroll report that existed at the time: the heavily caveated "preliminary scoping report," which does not appear to have been intended to serve any evidentiary purpose in a criminal proceeding.

[2] Kroll, "Project Tenor – Scoping Phase. Final Report" (April 2, 2015), available at: https://www.rise.md/wp-content/uploads/2017/03/Kroll-Shor-Melnic.pdf

[3] In fact, we understand that Mr. Dohotaru may himself have been the source at NBM from whom Kroll obtained instructions.

**MOTION EXHIBIT 1_PAGE_008**

> *"It **has not been possible** within the scoping phase to conduct sufficient analysis and investigations **to independently verify information** presented to us by the NBM."[4]*

26. Similarly, the language used throughout the Kroll report suggests an unquestioning acceptance of what the investigators have been told by the NBM rather than an evidence-based investigation leading to a considered conclusion. As such, its findings derive from restricted, untested, and unaudited source material, provided by a party which undoubtedly had a vested interest in the ultimate outcome of the investigation.

27. Mr. Shor will has sought to argue that the Kroll reports should not have been relied on, much less by Mr. Dohotaru, who was reportedly the source for many of the assertions in Kroll's "preliminary scoping report".

28. Mr. Shor's Moldovan counsel submitted an application to examine Mr. Dohotaru in the Cahul Court of Appeal before the Moldovan proceedings were relocated to the Chisinau Court of Appeal. The prosecution also requested Mr. Dohotaru as witness #1 on their witness list, which the Court approved. However, the prosecution thereafter advised the Court of Appeal that Mr. Dohotaru was unavailable to be examined, as he now resides in the United States, and cannot be compelled to travel to Moldova to give testimony. The prosecution proposed that the summary of Mr. Dohotaru's testimony from the first trial simply be read into the record of the evidentiary proceedings in the Court of Appeal, thereby depriving Mr. Shor's defense counsel of the ability to question Mr. Dohotaru on cross-examination.

29. Mr. Dohotaru has critical information about the allegedly fraudulent transactions involving the Moldovan Banks, NBM's actions and inactions in relation to those transactions, as well as his own incentives to testify favorably to the prosecution and against Mr. Shor. Documents in Mr. Dohotaru's possession relating to the Kroll reports are therefore potentially exculpatory and critically important to Mr. Shor's defense. Mr.

---

[4] Kroll, "Project Tenor – Scoping Phase. Final Report" (April 2, 2015), available at: https://www.rise.md/wp-content/uploads/2017/03/Kroll-Shor-Melnic.pdf

**MOTION EXHIBIT 1_PAGE_009**

Shor's defence needs to examine Mr. Dohotaru, especially in light of new evidence that has been acquired since the first trial.

30. This new evidence includes additional bank records contradicting Mr. Dohotaru's statements at trial, as well as Mr. Dohotaru's powerful motive to testify in accordance with the prosecution's theory. Indeed, according to Moldovan press reports, Mr. Dohotaru was arrested in April 2015 in connection with misfeasance while acting in his duty as a supervisor at NBM.[5] Yet Mr. Dohotaru was apparently never prosecuted and was allowed by Moldovan authorities to leave Moldova shortly after giving testimony against Mr. Shor in June 2017.

31. In summary, the continued reliance by the Court of Appeal on the evidence of Mr. Dohotaru (and thereby, indirectly, the Kroll report), without the defence being given the opportunity to cross-examine him as part of the *de novo* proceedings amounted to a significant breach of Mr Shor's right to a fair trial (Article 6 of the Convention).

32. For these reasons, Mr. Shor seeks Mr. Dohotaru's testimony—as well as any relevant documents he has in his custody or control—for use in his ongoing defense (before the Court of Cassation and, if necessary, before the ECtHR) of the serious criminal charges made against him in Moldova.

### *Political nature of the criminal proceedings against Mr. Shor*

33. The Chisinau Court of Appeal's decision to accept the hearsay evidence of Mr. Dohotaru and refuse Mr. Shor's application for time to obtain Mr. Dohotaru's deposition can only be fully understood in the wider context of this case. In my submission, there is sufficient basis to conclude that the ulterior motive for criminal proceedings against Mr. Shor and the (ongoing) inferences of his fair trial rights is to silence and punish him for his active social and political engagement. I will expand on the reasons for this below.

---

[5] Eugen Muravschi, "The story of Moldova's lost billion so far: Kroll report leaked, businessman arrested, ex-President involved," Moldova.org (May 7, 2015), https://www.moldova.org/en/the-story-of-moldovas-lost-billion-so-far-kroll-report-leaked-businessman-arrested-ex-president-involved/

**MOTION EXHIBIT 1_PAGE_010**

34. First, the popularity of the Şor Party appears to have been deemed a threat to Mr. Shor's political opponents. In the years since 2016, numerous steps have been taken against the Party and its members to undermine its power and influence, including but not limited to:

    (i)    multiple exclusions of Şor Party candidates from elections,

    (ii)    multiple cancellations of Şor Party members' parliamentary immunities for the purposes of criminally investigating them for minor alleged infractions,

    (iii)    refusal by the Central Electoral Commission of Moldova of Şor Party's funding allocation from the state budget (whereby the Party has been continuously deprived of its funding allocation every year since 2020),

    (iv)    government interference in peaceful protests organized by the Şor Party (whereby protestors have been prevented from travelling to the capital, and numerous misdemeanour and criminal cases have been instigated against the organisers and activists, involving arrests and detention), and

    (v)    commencement of a criminal investigation against the Şor Party in connection with alleged illicit financing.

35. Ultimately, on November 11, 2022, the then Prime Minister of Moldova, Ms. Natalia Gavrilita, applied to the Moldovan Constitutional Court requesting verification of the constitutionality of the Şor Party in light of Article 41(4) of the Constitution of Moldova.[6] According to the government, the verification of the constitutionality of the Party is justified for reasons including the alleged criminality of Mr. Shor. The hearing of this application before the Constitutional Court commenced in the week of 15 May 2023 and has been adjourned to 12 June 2023. It is worth noting that the President of the Constitutional Court was previously a member of the majority ruling party, and legal

---

[6] Which provides that *"Parties and other socio-political organisations, whose objectives or activities are the engagement in fighting against political pluralism, the principles of the rule of law, sovereignty, independence, and territorial integrity of the Republic of Moldova are declared unconstitutional."*

**MOTION EXHIBIT 1_PAGE_011**

counsel to the current President of Moldova, Ms. Maia Sandu. A recusal request filed by counsel for the Şor Party was, however, rejected as unfounded.

36. Second, there have been numerous instances of public statements made by high-ranking officials, reflecting their opinion that Mr. Shor is guilty before the conclusion of the criminal proceedings, such as:

(i)    By former President, Igor Dodon, who:

(a) In or around March 2015 (before charges had been brought against Mr. Shor), publicly accused Mr. Shor of appropriating $1 billion and stated that he *"is a thief that needs to be imprisoned and will be imprisoned sooner or later."*[7]

(b) In June 2020, stated publicly that the extradition of Mr. Shor from Israel *"is a topic of national interest"* and that *"I do not think that Israel has any interest in providing political cover to criminals. He will be imprisoned there or brought home."*[8]

(ii)   By former Prime Minister and current President, Maia Sandu, who:

(a) In August 2018, stated publicly that "*Those who stole the money and use it in various methods must be penalized, must go to prison. I referred first to Shor, but also to the other beneficiaries about whom he does not speak, but the time will come when he speaks*".[9]

(b) In July 2019, stated that she *"was lucky never to see Ilan Shor. And I hope we can all see him behind bars, through the press. You show him to us."*[10]

---

[7] https://www.youtube.com/watch?v=vyYcJgwEwzk&app=desktop
[8] NTV Moldova (June 4, 2020), "The extradition of the defendants Vladimir Plahotniuc and Ilan Şor is a subject of national interest, the head of state declared", https://ntv.md/index.php?newsid=33897
[9] Timpul.md (August 24, 2018), "Maia Sandu: All those who stole the money should go to prison; first of all Shor", https://www.timpul.md/articol/maia-sandu-toi--cei-care-au-furat-banii-sa-faca-pucarie-_in-primul-rand-or-134355.html
[10] Agora (July 26, 2019), "Maia Sandu, about Şor's accusations: I was lucky enough to never see him", https://agora.md/stiri/59871/maia-sandu-despre-acuzatiile-lui-sor-am-avut-fericirea-sa-nu-l-vad-niciodata

**MOTION EXHIBIT 1_PAGE_012**

(c) In December 2020, stated *"five years in a row, Igor Dodon has been shouting that Ilan Sor must be imprisoned for stealing the billion, but now they are accomplices and steal from the country together. Thieves have no nationality. They must be imprisoned."[11]*

37. It is of note that under Moldovan law (Article 466 of the Code of Criminal Procedure of the Republic of Moldova), where a defendant has been convicted at first instance, but has filed an appeal which has not yet been resolved, the conviction is not final and he continues to benefit from the presumption of innocence (Article 8, paragraph (1) of the Code of Criminal Procedure).

38. Third, senior public officials have exerted undue pressure on the judiciary in regard to the criminal proceedings against Mr. Shor.

39. Notably, on 25 July 2019, the preventative measure of provisional release under judicial control, which had been imposed on Mr. Shor following his conviction at first instance, was replaced with preventative arrest. It is unlikely to be a coincidence that this decision was made in the same month that Ms. Sandu stated publicly that she hoped to see Mr. Shor "*behind bars*" and only one month after Ms. Sandu had attended a meeting at the Superior Council of Magistracy calling for the replacement of judges who had made "*illegal decisions*" and stating "*... if things do not change here in the coming weeks, then we will look for a solution through the Parliament and the Government. We cannot continue to tolerate the frivolous, disrespectful attitude towards the law and towards the citizens when the whole country shouts justice...*".[12]

40. In addition to the statements made by Ms. Sandu at a meeting of the Superior Council of Magistracy in June 2019, in which she called for the replacement of judges who had made "illegal decisions" (see above), in February 2020, the Minister of Justice, Fadei Nagacevschi, was reported to have promised that he would request checks of judges

---

[11] https://www.youtube.com/watch?v=loVEC3m7ETA
[12] https://www.youtube.com/watch?v=zP7nVQk5t0s

**MOTION EXHIBIT 1_PAGE_013**

and prosecutors in the case against Mr. Shor.[13] In relation to the reported 23rd postponement of the proceedings before the Cahul Court of Appeal, Mr. Nagacevschi was quoted as stating on social media: "*This is a ridiculous situation, thus, as member of the Superior Council of Magistracy and the Superior Council of Prosecutors I will request checks of judges and prosecutors, who are investigating the case. I think they should be checked for disciplinary and professional competence.*"

41. Further, in December 2022, it was reported that Moldova's Ministry of Justice had drawn up its own version of the Magnitsky Act as part of efforts to tackle corruption.[14] understand, however, that, if enacted, this new law would be enforceable against nationals of Moldova, including those said to be acting against the interests of the Moldovan state (reportedly, this is intended to include Mr. Shor)[15], and could be used to prevent listed persons from entering the country, and to freeze their assets as well as the assets of their supporters. We understand that the proposed law would also entitle the media regulator to cancel the licence of any television station found to promote the interests of listed persons. Enforcement of the law would be delegated to a special committee under the control of the government and, specifically, the President.

42. Finally, we have been informed by Mr. Shor's Moldovan counsel that in late 2022, Mr Shor and various persons associated with him, including his legal representatives in the current proceedings (Mr. Colenco and Mr. Balan) as well as deputies of the Şor Party, were made the subject of informal financial sanctions. We understand that such persons have been included on a government "list" which was leaked and published on the internet. The individuals included on the list ("sanctioned" persons) have never formally been notified of their inclusion. However, the application of these informal sanctions, which have been imposed without legal basis and therefore without any prescribed mechanism for challenge, have resulted, we understand, in restrictions on

---

[13] Infotag.md (February 24, 2020), "Justice minister to check judges and prosecutors handling Ilan Shor case", https://www.infotag.md/populis-en/282775/
[14] Moldpress.md (December 9, 2022), "Moldova likely to have Magnitsky Act", https://www.moldpres.md/en/news/2022/12/09/22009477
[15] Intellinews (December 12, 2022), "Moldova plans its own take on Magnitsky Act as UK sanctions opposition politicians", https://www.bne.eu/moldova-plans-its-own-take-on-magnitsky-act-as-uk-sanctions-opposition-politicians-264947/?source=moldova

**MOTION EXHIBIT 1_PAGE_014**

"sanctioned" persons' ability to conduct financial transactions through Moldovan banks or with the assistance of Moldovan lawyers, notaries and other professionals.

43. It is of note that both Mr. Shor's Moldovan counsel and his UK counsel were prevented by the Court of Appeal from making submissions during closing arguments on April 12, 2023 in support of the argument that the proceedings against Mr. Shor are politically motivated. The Court indicated that it did not wish to hear such arguments and instructed Mr. Shor's defence counsel to focus only on the evidence in the case file and cease making submissions in support of the argument.

44. In my submission, the criminal proceedings against Mr. Shor amount to a violation of Article 18 of the Convention (read with Article 5[16] and 6 of the Convention), which prohibits the restriction of rights and freedoms enshrined in the Convention for purposes not prescribed by the Convention itself.

45. A breach of Article 18 can arise even where there is no violation of the substantive right at issue, where a restriction applied for a purpose not prescribed by the Convention appears to be a fundamental aspect of the case. That will, for example, be the case where the purpose of criminal proceedings was to intimidate the accused; silence and punish him for his active social and political engagement; or to suppress political pluralism.

46. Article 18 of the Convention permits, therefore, in conjunction in conjunction with Article 6, an examination of the fairness of the defendant's criminal prosecution and its allegedly ulterior motives.

*Conclusion*

47. Mr. Dohotaru is the key prosecution witness. He has information related to NBM's actions and inaction in relation to the transactions involving the Moldovan Banks, his reliance on the Kroll reports, as well as his own interactions with Moldovan prosecutors. These issues are of critical importance to the criminal proceedings against

---

[16] *"Everyone has the right to liberty and security of person. No one shall be deprived of his liberty save in the following cases and in accordance with a procedure prescribed by law..."*

**MOTION EXHIBIT 1_PAGE_015**

Mr. Shor, as they bear on the merits of the serious charges against him, as well as the reliability of Mr. Dohotaru's evidence.

48. As explained above, while listing Mr. Dohotaru as a witness in the appeal proceedings, the prosecution represented that it could not produce Mr. Dohotaru to be examined by the defense because he no longer resides in Moldova. Given that Mr. Dohotaru is a non-party to the Moldovan proceedings, and that he now resides in the United States, his testimony for use in the ongoing proceedings—and, in particular, for use in Mr. Shor's defense—is unattainable absent this Court's assistance under Section 1782.

49. Only by obtaining documentary and testimonial evidence from Mr. Dohotaru can Mr. Shor hope effectively to dispute the evidence relied upon by the prosecution. At the very least, he must be allowed to confront the key witness against him and to test Mr. Dohotaru's account for the purpose of the pending cassation proceedings in Moldova.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 1st day of June 2023 in London, United Kingdom.

/S/

SHAUL BRAZIL

**MOTION EXHIBIT 1_PAGE_016**

# EXHIBIT A



STATE OF NEW YORK        )
                         )   ss
COUNTY OF NEW YORK       )

**CERTIFICATION**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Romanian into English of the attached Judgment.

_____

Lynda Green, Senior Managing Editor
Lionbridge

Sworn to and subscribed before me

this _25_ day of _October_, 20 _22_ .

_____

JEFFREY AARON CURETON
NOTARY PUBLIC-STATE OF NEW YORK
No. 01CU6169789
Qualified in New York County
My Commission Expires 09-23-2023

**CASE FILE No. 14-1-10386-24082016 (1-439/17)**

**JUDGMENT**

*In accordance with the Law*

June 21, 2017                                                                 *Chisinau Municipality*

*Buiucani District Court of Chisinau Municipality*

*The Court composed of:*

*President of the hearing,*

*Judge*                                                                            *Andrei Niculcea*

*Court clerks*                                                    *Alina Spataru, Gabriela Rotaru*

*with participation of:*

*Prosecutor* – Andrei Baesu, prosecutor from Anticorruption Prosecutor's Office;

*Advocate* – Denis Ulanov, who is acting in the interests of the defendant Ilan Sor, based on mandate no. 0885889 from 06.22.2016;

*Advocate* – Iulian Balan, who is acting in the interests of the defendant Ilan Sor, based on mandate no.0923811 from 06.22.2016;

*Defendant* – Ilan Sor, son of Miron, date of birth: March 06, 1987, citizen of the Republic of Moldova;

Representative of the civil plaintiff – Oleg Cojuhari;

Interpreters – Olga Mihalas, Stanislav Ungureanu, Bogdan Calugarescu, Iurie Gustiuc, Iulia Ganea Ersen, Elena Marcinschi;

examining in a closed court hearing, in the official language, following the general procedure, the criminal case concerning the indictment against:

> **Ilan Șor, son of Miron**, born on March 06, 1987, citizen of the Republic of Moldova, native of Israel, resident of Chisinau Municipality, 62, Lacului Street, having completed higher education, employed as Mayor of the city of Orhei, married with two young children, not completed military service, without any degree of disability, with knowledge of the official language, not on the files of any addiction specialist or psychiatrist, does not speak the official language, in the present case was detained on June 22, 2016; he was held in preventive detention until August 5, 2016; […]

1

**MOTION EXHIBIT 1_PAGE_019**

[…]

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

**The witness Dohotaru Matei**, who claimed that in November 2014 he was working in the National Bank of Moldova as Deputy Director of the Banking Supervision Department and at the end of November (does not remember the date) was appointed to the post of special administrator at BC Banca Socială SA. The companies "CARITAS GROUP" S.R.L, "VOXIMAR COM" S.R.L., "PROVOLIROM" S.R.L., and Dracard SRL received loans during November from BC Banca de Economii SA. The financial resources for granting these loans were used for the interbank

**MOTION EXHIBIT 1_PAGE_020**

investments received from several banks from the Republic of Moldova, amounting to more than 2.5 billion MDL. It was subsequently shown that these loans were used to close other loans from BC Unibank SA, BC Banca Socială SA, and BC Banca de Economii SA. This was the first instance of lending to the respective companies in November 2014. Then, the respective companies at the end of November were credited by BC Banca Socială SA, except that in the case of Banca Socială lending to these companies, there was a suspicion that fictitious financial resources were used. In this regard, the criminal prosecution office had statements submitted by some of the bank's employees who had made changes, as they mentioned on the instructions of the bank's management, as well as by confirmation from Privat Bank from Latvia, which indicated that it did not offer overdraft facilities for BC Banca Socială SA accounts opened with them. Subsequently, the loans granted by BC Banca Sociala SA were assigned to non-resident company Fortuna United. The assignment took place in breach of the legislation in force, being, in this respect, a court decision. The National Bank of Moldova challenged the organization of the extraordinary general meeting of BC Banca Sociala SA on the grounds of it being organized in breach of the legislation in force. He indicated that 8 billion was the exposure to the Sor group in early November 2014, and 13 billion is the final amount for the companies mentioned by the prosecutor. The increase from 8 to 13 billion was brought about by the interbank investments received by BC Banca de Economii SA during November 2014 from several banks in the Republic of Moldova. He indicated that, as far as he knows, at the National Bank of Moldova only some copies of the SWIFT messages are kept. The remit of the banking supervision department does not include monitoring the operations performed by the banks; it monitors prudential indicators imposed on banks. There are no prudential indicators imposed on banks relating to SWIFT transactions. The respective banks reported daily to the National Bank of Moldova a series of information concerning compliance with the prudential indicators, such as the risk-weighted capital adequacy indicator, first principle and second principle of liquidity, open foreign exchange position indicators, and other information. He stated that he does not remember when restrictions were placed on the loan activities of BC Banca de Economii SA, but knows that some stricter requirements were imposed on the financial situation of debtors in particular, so that the bank did not grant loans to debtors who did not have the capacity to reimburse them. Both BC Banca Sociala SA and BC Banca de Economii SA presented information according to the Instruction on the way of presenting the reports for prudential purposes and the Instruction on the financial situation of the bank. The information was presented in electronic format, according to the reporting portal used by all the banks from Moldova. Some information could also be presented via email. Information of ad hoc types was presented, which was supplied as required or when it was needed to clarify some aspects. During the operation of these banks, there could have been violations of the prudential indicators, but he could not remember these situations. But the serious violation of the indicators at BC Banca Sociala SA and BC Banca de Economii SA took place at the end of November. If he is not mistaken, the indicators for risk-weighted capital adequacy and the second liquidity principle had been violated. He mentioned that, immediately, the National Bank of Moldova established the special administration regime. The special administration regime was clearly provided for by the legislation at that time and could be established only in certain circumstances. Not every violation of the Bank can be used as grounds for establishing the special administration regime because it can generate panic in the banking system, so it is applied only in circumstances strictly provided for by law. He cannot remember if BEM and BS on the date of 10.31.2014 were compliant with all the regulations of the NBM. The exposures of the banks MAIB, CB, MICB, ECB, in comparison with BEM were considerably higher than the bank's capital. In addition, the National Bank of Moldova had made several attempts

**MOTION EXHIBIT 1_PAGE_021**

to modify the limit of interbank exposures, but the NBM's decisions were suspended at the requests of the shareholders from BC Unibank SA, immediately after the National Bank established the special administration regime. The request of the respective shareholders was rejected by the court, and the relevant ruling entered into force. He claimed that the National Bank of Moldova had no right to block transactions, To do this, what is known as a special administration regime is required. The NBM did not intervene in the relations between the banks and their clients. These transactions were performed between banks and, at that time, there were no prudential limits imposed relating to them, for the reasons mentioned above. These interbank investments had a of value 2.5 billion MDL, and the total amount of the fraud is about 13 billion MDL. The investments are only part of the money embezzled. The witness stated that he did not know what the amount of liquid assets was at the banks BC Banca de Economii SA, BC Banca Sociala SA, and BC Unibank SA. At least, according to the reports of these 3 banks, it was reported that liquid assets accounted for more than 20% of the total of assets, which is a potential indicator. He claimed that he personally was not responsible for the monitoring of daily interbank investments. It is also difficult for him to respond as to whether these were seen or not. No one verified the method of approval of these loans at the time of approval. Verification took place subsequently when these violations were detected. The NBM cannot verify online whether a particular loan is granted correctly or not. This action is performed in a selective way, usually once a year during the site checks. The fact that the bank reported the approvals of these loans to the NBM, and the latter did not establish immediately that the credits were granted with violations, does not mean that the violations did not occur. The violations were subsequently detected in the special administration process for the banks. Subsequently, it was found that the pledges were fictitious. The banks from the Russian Federation did not confirm the guarantees issued for the Moldovan banks, and further violations were detected involving the procedure for granting loans. The lack of investment guarantees from the Russian Federation banks have been confirmed by SWIFT messages, as well as through their financial reports published on the website. The fictitious transactions were defined as transactions for loans granted by BC Banca Sociala SA in the absence of funds in the corresponding accounts, by carrying out manipulations on the information system, a fact confirmed by the employees of Banca Sociala SA. The absence of the appropriate resources was also confirmed by Privat Bank through an official letter. He declared that during special monitoring SWIFT messages were identified which were subsequently declared as invalid by the correspondent banks. He claimed that, in the circumstances where Privat Bank from Latvia stated that it did not grant overdraft facilities to Banca Sociala for granting loans, and the employees of Banca Sociala recognized that manipulations were carried out on the information system of the bank to register these loans, the only logical conclusion that can be made from these statements is that the transactions were fictitious. He indicated that there is an email from Banca Sociala, where the bank employees discussed with the employees of Sor Holding about the loans being granted by the bank, the copies of which were sent to the prosecution agencies. He indicated that the National Bank of Moldova concluded with the company Kroll 2 contracts whose purpose was to investigate the bank fraud and identify the parties involved. From the reports presented by Kroll, the involvement of Ilan Sor is confirmed in the relevant fraud. In this regard, the National Bank of Moldova published several releases on the website about the investigation results. It is assumed that the amount of 5.2 billion MDL is the difference between the exposure from the end of November 2014 and the start of November 2014. This calculation was performed by the manager of Banca de Economii, which should be explained. (n.d. 207-212, Volume XV)

**MOTION EXHIBIT 1_PAGE_022**

   *Consequently, by the statement from the witness Dohotaru Matei it is established that the companies "CARITAS GROUP" S.R.L., "VOXIMAR COM" S.R.L., "PROVOLIROM" S.R.L., and "DRACARD" SRL received loans during November from B Banca de Economii SA. The financial resources for granting these loans were used for the interbank placements received from many banks from the Republic of Moldova, amounting to more than 2.5 billion MDL. Subsequently, it was identified that these loans were used for the closure of other loans from BC Unibank SA, BC Banca Sociala SA, and BC Banca de Economii SA. The fact that the bank reported the approval of these loans to the NBM and did not establish immediately that these loans were granted with violations does not mean that the violations did not occur. The violations were subsequently detected in the special administration process for banks, when it was found that the pledges were fictitious, because the banks from the Russian Federation did not confirm the issued guarantees for the Moldovan banks, and more violations were identified of the procedure for granting loans. The absence of investment guarantees from the banks from the Russian Federation was confirmed through SWIFT messages, as well as by their financial reports published on the website. The fictitious transactions were defined as transactions for loans granted by BC Banca Sociala SA in the absence of funds in the corresponding accounts, through carrying out manipulations on the information system, a fact confirmed by the employees of Banca Sociala SA. The absence of the appropriate resources was also confirmed by Privat Bank through an official letter. He declared that during special monitoring SWIFT messages were identified which were subsequently declared as invalid by the correspondent banks. He claimed that, in the circumstances where Privat Bank from Latvia stated that it did not grant overdraft facilities to Banca Sociala for granting loans and the employees of Banca Sociala recognized that manipulations were carried out on the information system of the bank to register these loans, the only logical conclusion that can be made from these statement, is that the transactions were fictitious. The witness indicated that from the reports presented by the Kroll company, the involvement of Ilan Sor in the bank fraud is confirmed.*

   […]

42

**MOTION EXHIBIT 1_PAGE_023**

DOSARUL: NR. 14-1-10386-24082016 (1-439/17)

# S E N T I N Ţ A
*În Numele Legii*

21 iunie 2017            municipiul Chişinău

Judecătoria Chişinău, sediul Buiucani

Instanţa compusă din:

preşedintele şedinţei,

judecătorul                     Andrei Niculcea

grefier                 Alina Spătaru, Gabriela Rotaru

cu participarea:

*procurorului* – Andrei Baeşu, procuror în Procuratura Anticorupţie;

*apărătorului* – Denis Ulanov, care acţionează în interesele inculpatului Şor Ilan, în baza mandatului nr.0885899 din 22.06.2016;

*apărătorului* – Iulian Balan, care acţionează în interesele inculpatului Şor Ilan, în baza mandatului nr.0923811 din 22.06.2016;

*inculpatului* - Şor Ilan fiul lui Miron, născut la 06 martie 1987, cetăţean al Republicii Moldova;

*reprezentantului părţii civile* – Cojuhari Oleg;

*interpretului* – Olga Mihalaş, Ungureanu Stanislav, Călugăreanu Bogdan, Iurie Guştiuc, Iulia Ganea Ersen, Elena Marcinschi;

examinând în şedinţă de judecată închisă, în limba de stat, în procedură generală, cauza penală privind acuzarea lui:

> **Şor Ilan fiul lui Miron,** născut la 06 martie 1987, cetăţean al Republicii Moldova, originar din Israel, domiciliat în mun.Chişinău, str.Lacului, nr.62, studii superioare, angajat în calitate de primar al or.Orhei, căsătorit, la întreţinere doi copii minori, nesupus militar, fără grad de invaliditate, posedă limba de stat, la evidenţa medicului narcolog şi psihiatru nu se află, nu posedă limba de stat, în prezenta cauză a fost reţinut la data de 22 iunie 2016, până la data de 05 august 2016 s-a aflat în stare de arest preventiv, în prezent se află în stare de arest la domiciliu anterior nejudecat,

învinuit în comiterea infracţiunilor prevăzute de art.190 alin.(5) şi art.243 alin.(3) lit.b) din Codul penal.

Procurorul în Procuratura Anticorupţie, Andrei Baeşu a pledat pentru:

- a-l recunoaşte pe Şor Ilan, vinovat de săvârşirea infracţiunii prevăzute de art.190 alin.(5) din Codul penal, stabilindu-i o pedeapsă sub formă de închisoare pe un termen de 13 ani, cu privarea de dreptul de dreptul de a ocupa anumite funcţii în sistemul bancar pe un termen de până la 5 ani;

- a-l recunoaşte pe Şor Ilan, vinovat de săvârşirea infracţiunii prevăzute de art.243 alin.(3) lit.b) din Codul penal, stabilindu-i o pedeapsă sub formă de închisoare pe un termen de 8 ani;

- a-i stabili lui Şor Ilan, o pedeapsă definitivă pentru concurs de infracţiuni, prin cumul parţial al pedepselor aplicate, sub formă de închisoare pe un termen de 19

semnăturile digitale și parolele pentru serviciu client banking pentru companiile menționate și le-a transmis lui Petrov Alexandru. Totodată, se confirmă faptul că, ultimul era persoana responsabilă de efectuarea transferurilor la aceste companii.

**Martorului Ursu Ivan,** care a menționat că, a activat în perioada anului 2013 în BC Unibank SA, iar în perioada anilor 2013- 2014 a activat în cadrul BC Banca de Economii SA, în calitate consilier al președintelui băncii pe securitate, iar din octombrie 2014 a fost ales în consiliul de administrare al băncii. În perioada cât a activat în cadrul consiliului băncii a participat la adoptarea deciziilor de creditare a companiilor „CARITAS GROUP" S.R.L., „VOXIMAR COM" S.R.L., „PROVOLIROM" S.R.L. și Dracard SRL. Inițiativa de acordare a acestor credite a aparținut fostului președinte al consiliului de administrare, Șor Ilan. Ultimul îi convingea că sunt companii prospere și anterior au fost creditate de BC Banca de Economii SA și s-au achitat în termen, banca având de câștigat dobânzi din urma acestor credite. A susținut că, din documentele care erau pregătite și prezentate de subdiviziunile de profil se crea impresia că sunt companii reale și profitabile cu gaj necesar de a fi completat. A indicat că, inculpatul Șor Ilan îi convingea că cunoaște aceste companii și nu este temei pentru a nu le credita. Inculpatul Șor Ilan în calitatea sa de președinte al consiliului cunoștea acestea companii, mai cu seamă că vine din lumea businessului, iar încă un argument în favoarea semnării adoptări aceste decizii era faptul că dânsul punea semnătura pe propria răspundere pe aceste creditări. A comunicat martorul că, într-o discuție privată cu inculpatul Șor Ilan, ultimul i-a spus că beneficiarul acestor credite este ex-prim-ministrul Filat Vladimir. (f.d.30, Vol.XV)

*Astfel, prin declarațiile martorului Ursu Ivan, se relevă că, acesta în calitatea sa de membrul al consiliului de administrare al BC Banca de Economii SA, și-a exprimat votul pentru acordarea creditelor companiilor „CARITAS GROUP" S.R.L., „VOXIMAR COM" S.R.L., „PROVOLIROM" S.R.L. și Dracard SRL, în urma convingerii inculpatului Șor Ilan, care îl asigura că acestea sunt companii prospere și banca va obține profit în urma tranzacțiilor. Totodată, a confirmat că, inculpatul i-a comunicat că beneficiarul acestor credite este ex-prim-ministrul Filat Vladimir.*

**Martorului Covalenco Oxana,** care a menționat că, pe parcursul anului 2013 deținea funcția de contabil la compania Deufremol SRL. Companiile „Devema Com" SRL, Dracard SRL, „Lavim Impex SRL, Univest Invest SRL, Alvaro Grup SRL, Elcomed Prim SRL, Storad Grup SRL, „VOXIMAR COM" S.R.L., îi sunt cunoscute. Aproximativ la sfârșitul anului 2013, Șor Ilan, i-a solicitat să ia semnăturile digitale pentru clienții Băncii Sociale, astfel le-a ridicat și le-a transmis lui Petrov Alexandru. A indicat că, personal nu a efectuat nici un fel de tranzacții, deoarece nu a avut acces la conturile companiei. (f.d.35, Vol.XV)

*Astfel, prin declarațiile martorului Covalenco Oxana se constată că, acesta a transmis semnăturile digitale de la companiile „Devema Com" SRL, Dracard SRL, „Lavim Impex SRL, Univest Invest SRL, Alvaro Grup SRL, Elcomed Prim SRL, Storad Grup SRL, „VOXIMAR COM" S.R.L. lui Petrov Alexandru.*

**Martorului Dohotaru Matei,** care a susținut că, în luna noiembrie 2014, activa în cadrul Băncii Naționale a Moldovei în calitate de director adjunct al Departamentului supraveghere bancară, iar la sfârșitul lunii noiembrie data nu o ține minte, a fost numit în calitate de administrator special la BC Banca Socială SA. Companiile „CARITAS GROUP" S.R.L., „VOXIMAR COM" S.R.L., „PROVOLIROM" S.R.L. și Dracard SRL au primit credite pe parcursul anului 2013 de la BC Banca de Economii SA.

Resursele financiare pentru acordarea acestor credite au servit plasamentele interbancare primite de la mai multe bănci din Republica Moldova, peste 2,5 miliarde lei. Ulterior a fost identificat că creditele respective au fost utilizate pentru închiderea altor credite de la BC Unibank SA, BC Banca Socială SA și BC Banca de Economii SA. Aceasta a fost primul episod de creditare a companiilor respective în luna noiembrie 2014. Ulterior, companiile respective la sfârșitul lunii noiembrie au fost creditate de către BC Banca Socială SA, doar că în cazul de creditare a acestor companii de către BC Banca Socială SA a existat suspiciune că au fost folosite mijloace financiare fictive, în aceste sens organului de urmărire penală au fost prezentate declarațiile unor angajații ai băncii care au făcut modificări, după cum au menționat aceștia la indicația conducerii băncii, precum și confirmarea băncii Privat Bank din Letonia care a indicat că nu a oferit împrumuturi overdraft pentru conturile BC Banca Socială SA deschise la ea. Ulterior aceste credite acordate de BC Banca Socială SA au fost cesionate unei companii nerezidente Fortuna United. Cesionarea a avut loc cu încălcarea legislației în vigoare, în acest sens fiind o decizie a instanței de judecată. Banca Națională a Moldovei a contestat organizarea adunării generale extraordinare a BC Banca Socială SA pe motiv că a fost organizată cu încălcarea legislației în vigoare. A indicat că, 8 miliarde este expunerea față de grupul Șor la începutul lunii noiembrie 2014, iar 13 miliarde este suma finală a companiilor menționate de procuror. Majorarea de la 8 la 13 miliarde, s-a efectuat cu ajutorul plasamentelor interbancare primite de la BC Banca de Economii SA pe parcursul lunii noiembrie 2014 de la mai multe bănci din Republica Moldova. A indicat că din câte cunoaște la Banca Națională a Moldovei se păstrează doar o parte din copiile mesajelor SWIFT. În competența Departamentului supraveghere bancară nu intră monitorizarea operațiunilor efectuate de către bănci, acesta monitorizează indicatorii prudențiali impuși băncilor. Nu există indicatori prudențiali impuși băncilor aferent tranzacțiilor SWIFT. Băncile respective raportau zilnic către Banca Națională a Moldovei o serie de informație aferentă respectării indicatorilor prudențiali cum ar fi indicatorul suficienții capitalului ponderat la risc, principiul unul și principiul 2 ai lichidității indicatorilor poziției valutare deschise și alte informații. A declarat că, nu-și aduce aminte când au fost introduse restricții la activitatea de creditare a BC Băncii de Economii SA, însă cunoaște că au fost impuse unele cerințe mai dure față de situația financiară a debitorilor în special, ca banca să nu acorde credite debitorilor care nu au capacitate de rambursare a acestora. Atât BC Banca Socială SA cât și BC Banca de Economii SA prezentau informații conform Instrucțiunii privind modul de prezentare a rapoartelor în scopul prudențiale și Instrucțiunii priind situația financiară a băncii. Informația se prezenta în format electronic, conform portalului de raportare utilizat de toate băncile din Moldova. O parte din informație putea fi prezentată și prin poșta electronică. Acestea prezentau informații de tip ad-hoc care se acordau la necesitate ori de câte trebuia de clarificat anumite aspecte. Pe parcursul activității acestor bănci, poate și au fost încălcări a indicatorilor prudențiali dar nu-și aduce aminte de aceste situații, însă încălcarea severă a indicatorilor la BC Banca Socială SA și BC Banca de Economii SA a avut loc la sfârșitul lunii noiembrie, dacă nu greșește au fost încălcați, indicatorii suficienței capitalului ponderat la risc și principiul II al lichidității. A menționat că, imediat Banca Națională a Moldovei a instituit administrarea specială. Regimul de administrare specială era clar prevăzut de legislația la acel moment și putea fi instituit doar în anumite circumstanțe. Nu orice încălcare a băncii poate servi temei pentru instituirea regimului de administrare specială, deoarece poate genera panică în sistemul bancar republică în circumstanțe strict

MOTION EXHIBIT 1_PAGE_027

40

prevăzute și amintește dacă la data de 31.10.2014, BEM și BS respectau toate reglementările BNM. Expunerile băncilor MAIB, VB, MICB, ECB, față de BEM erau considerabil comparativ cu capitalul pe care le dețineau aceste bănci. De altfel, Banca Națională a Moldovei a avut câteva încercări a modifica limita expunerilor interbancare, însă deciziile BNM au fost suspendate la cererea unor acționari de la BC Unibank SA, imediat după instituirea de către Banca Națională a administrării speciale. Cererea acționarilor respectivi a fost respinsă de către instanță și hotărârea respectivă a intrat în vigoare. A susținut că, Banca Națională a Moldovei nu este în drept să blocheze tranzacții, pentru aceasta este nevoie de instituirea unui regim special numit administrarea specială. BNM nu intervine în relația dintre bănci și clienții acestora, aceste tranzacții au fost realizate între bănci și la acel moment nu erau impuse careva limite prudențiale aferent acestora pe motivele menționate mai sus. Aceste plasamente interbancare au constituit ca valoare 2,5 miliarde de lei, iar suma totală a fraudei este de aproape 13 miliarde de lei. Plasamentele constituie doar o parte a banilor fraudați. A declarat martorul că, nu cunoaște care era suma lichidităților la băncile BC Banca de Economii SA, BC Banca Socială SA și BC Unibank SA, cel puțin conform rapoartelor toate 3 bănci, raportau active lichide peste 20 % din totalul de active, acesta este indicatorul potențial. A susținut că, personal nu a fost responsabil de monitorizarea plasamentelor interbancare zilnice, respectiv îi este dificil să răspundă dacă acestea au fost văzute sau nu. Nimeni nu a verificat modul de acordare a acestor credite la momentul acordării. Verificarea a avut loc ulterior când și au fost depistate încălcările. BNM nu poate să verifice în regim online cât de corect se acordă un credit sau altul, acest lucru se face selectiv de regulă odată în an în cadrul controalelor pe teren. Faptul că banca a raportat acordarea acestor credite la BNM și aceasta imediat nu a stabilit că acestea sunt acordate cu încălcări, nu înseamnă că încălcările nu au existat. Încălcările au fost depistate ulterior în procesul de administrare specială a băncilor. Ulterior, s-a constat că gajurile au fost fictive, băncile din Federația Rusă nu a confirmat garanțiile emise pentru băncile moldovenești, precum și au fost identificate mai multe încălcări la procedura de acordare a creditelor. Lipsa plasamente-garanții ale băncilor din Federația Rusă au fost confirmate prin scrisori mesaje SWIFT, precum și rapoartele lor financiare publicate pe pagina Web. Tranzacțiile fictive au fost definite tranzacții de acordarea creditelor de către BC Banca Socială în lipsa mijloacelor în conturile corespondente, prin aplicarea manipulărilor din sistemul informațional fapt confirmat de angajații Băncii Sociale SA. Lipsa mijloacelor corespondente a fost confirmată și de Privat bank prin scrisoare oficială. A declarat că, în cadrul supravegherii speciale au fost identificate mesaje SWIFT care ulterior de către băncile corespondente au fost declarate nule. A susținut că, în condițiile în care Privat Bank din Letonia a declarat că nu a oferit mijloace overdraft Băncii Sociale pentru acordarea creditelor și angajații Băncii Sociale au recunoscut că au făcut manipulării în sistemul informațional al băncii pentru a înregistra aceste credite, unica concluzie logică care poate fi făcută din aceste declarații este că tranzacțiile au fost fictive. A indicat că există corespondența de e-mail a Băncii Sociale, unde angajații băncii discutau cu angajații companiei Șor Holding despre acordarea creditelor de către bancă, copiile acestei corespondențe au fost transmise organelor de urmărire penală. A indicat că, Banca Națională a Moldovei a încheiat cu compania Kroll, 2 contracte a căror scop a fost investigarea fraudei bancare și identificarea părților implicate. Din rapoartele prezentate de compania Kroll, se confirmă implicarea cetățeanului Șor Ilan în frauda respectivă, în acest sens Banca Națională a Moldovei a publicat informațiile comunicate, pe pagina sa web cu privire la

MOTION EXHIBIT 1_PAGE_028

41

expunerea de la sfârșitul lunii noiembrie 2014 și începutul lunii noiembrie 2014. Acest calcul a fost efectuat de administratorul Băncii de Economii care urmează să se expună. (f.d.207-212, Vol.XV)

*Astfel, prin declarațiile martorului Dohotaru Matei se stabilește că, companiile „CARITAS GROUP" S.R.L., „VOXIMAR COM" S.R.L., „PROVOLIROM" S.R.L. și Dracard SRL au primit credite pe parcursul lunii noiembrie de la BC Banca de Economii SA. Resursele financiare pentru acordarea acestor credite au servit plasamentele interbancare primite de la mai multe bănci din Republica Moldova, peste 2,5 miliarde lei. Ulterior a fost identificat că creditele respective au fost utilizate pentru închiderea altor credite de la BC Unibank SA, BC Banca Socială SA și BC Banca de Economii SA. Faptul că banca a raportat acordarea acestor credite la BNM și imediat nu s-a stabilit că acestea sunt acordate cu încălcări, nu înseamnă că încălcările nu au existat. Încălcările au fost depistate ulterior în procesul de administrare specială a băncilor, când s-a constatat că gajurile au fost fictive, deoarece băncile din Federația Rusă nu au confirmat garanțiile emise pentru băncile moldovenești precum și au fost identificate mai multe încălcări la procedura de acordare a creditelor. Lipsa plasamente-garanții ale băncilor din Federația Rusă au fost confirmate prin scrisori mesaje SWIFT, precum și rapoartele lor financiare publicate pe pagina Web. Tranzacțiile fictive au fost definite tranzacții de acordarea creditelor către BC Banca Socială în lipsa mijloacelor în conturile corespondente, prin aplicarea manipulărilor din sistemul informațional, fapt confirmat de angajații Băncii Sociale SA. Lipsa mijloacelor corespondente au fost confirmată și de Privat Bank prin scrisoare oficială. A declarat că, în cadrul supravegherii speciale au fost identificate mesaje SWIFT care ulterior de către băncile corespondente au fost declarate nule. A susținut că, în condițiile în care Privat Bank din Letonia a declarat că nu a oferit mijloace overdraft Băncii Sociale pentru acordarea creditelor și angajații Băncii Sociale au recunoscut că au făcut manipulării în sistemul informațional al băncii pentru a înregistra aceste credite, unica concluzie logică care poate fi făcută din aceste declarații este că tranzacțiile au fost fictive. A indicat martorul că, din rapoartele prezentate de compania Kroll, se confirmă implicarea cetățeanului Șor Ilan în frauda bancară*

**Martorului Bargueva Irina**, care a menționat că, în luna noiembrie a anului 2014 deținea funcția de contabil-șef în cadrul Băncii de Economii. A menționat că, în anul 2014 Banca Națională monitoriza Banca de Economii, respectiv în fiecare zi se transmitea bilanțul descifrat până la orele 12:00. Suplimentar se prezentau lămuriri, explicații la fiecare tranzacție care era mai mare de 2 milioane de lei. A indicat că, nu-și aduce aminte denumirile companiilor cărora li se acordau credite, însă creditele erau reflectate în bilanț conform planului de conturi aprobat de Banca Națională a Moldovei, conform actelor normative și Regulamentului bancar al Băncii de Economii. De asemenea se reflectau și creditele restituite. Nu cunoaște dacă toate creditele au fost rambursate. (f.d.3, Vol.XVI)

*Astfel, prin declarațiile martorului Bargueva Irina se confirmă că, în anul 2014, activitatea Băncii de Economii era monitorizată de Banca Națională a Moldovei, respectiv în fiecare zi se transmitea bilanțul descifrat, în care se indica creditul acordat și sumele rambursate.*

**Martorului Railean Vlad**, care a relatat că, în anul 2014 a deținut funcția de contabil șef-adjunct, șef secție conturi corespondente și decontări în cadrul Băncii de Economii. Banca Națională a Moldovei a exercitat monitorizarea Băncii de Economii

MOTION EXHIBIT 1_PAGE_029

# EXHIBIT B



STATE OF NEW YORK     )
                         )
                         )    ss
COUNTY OF NEW YORK  )

## **CERTIFICATION**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Romanian into English of the attached Appeal.

_____

Lynda Green, Senior Managing Editor
Lionbridge

Sworn to and subscribed before me

this _25_ day of _October_, 20 _22_.

_____

JEFFREY AARON CURETON
NOTARY PUBLIC-STATE OF NEW YORK
No. 01CU6169789
Qualified in New York County
My Commission Expires 09-23-2023

**MOTION EXHIBIT 1_PAGE_031**

Prosecutor's Office of the Republic of Moldova

# Anticorruption Prosecutor's Office

*Republic of Moldova, MD-2004, Chisinau municipality, 198 Stefan cel Mare boulevard*
*tel. (+373 22) 257-401, fax (+373 22) 257-361, e-mail: proc-ant@procuratura.md*

07.28.2017 no.*01-17A-18/17-7823*

Chisinau Court of Appeal

### APPEAL

filed by the prosecutor in the Anticorruption
Prosecutor's office Andrei Baesu, on
the sentence given by Chisinau Court,
Buiucani office dated 06.21.2017 regarding
the defendant Shor Ilan Miron

[stamp:] Supreme Council of Magistrates, Chisinau court of law, Buiucani office, Incoming No. *26764, 07.28.2017*

**Motives of the appeal**
**(unfounded sentence)**

By the sentence of the Chisinau court, Buiucani office dated 06.21.2017 Mr. Shor Ilan Miron, born on 08.06.1987, was convicted for committing the offenses provided by art. 196 par.(4) and 243 par.(3) letter b) of the Criminal Code, being established a definitive sentence by partial cumulation of punishments of 7 years and 6 months imprisonment.

Ilan Shor was accused of abusing the trust of the persons in charge at the financial institution "Banca de Economii" SA who were obliged to receive and verify the request for loans and all the documents required to be received from natural and legal persons, being in prior agreement with other decision makers within the bank, with the intention of appropriating the financial means belonging to CB "Banca de Economii" SA, illegally acquired the financial means from the bank through the companies specifically founded by him to be involved in such banking operations, such as "VOXIMAR COM" LLC, f.c 1013600015933, "DRACARD" LLC, f.c. 1013600020401, "PROVOLIROM" LLC, f.c. 1013600020353 and "CARITAS GROUP" LLC f.c. 1012600033082, creating the appearance of some legal persons with the capacity of proper administration and management, as well as creating the appearance of legality of the loan application and the opportunity of granting a loan, which as a result of his criminal actions caused a loss to the bank for an amount of **5 291 708 829.71 lei** MDL *(an offense provided in art. 190 paragraph (5) of the Criminal Code - fraud, characterized by the illicit acquisition of goods of another person, by deception and abuse of trust, with the use of the service situation, committed in very large proportions)*.

Subsequently, in order to achieve its criminal purpose, namely to attribute a legal aspect to the source and origin of the illicit income for a total amount of **5 291 708 829.71 MDL**, as well as concealing the origin or belonging of such income committed multiple identical criminal actions, as a whole constituting actions for money laundering *(art. 243 par. (3) letter b) of the Criminal Code - money laundering, characterized by the conversion and transfer of the Goods by a person who knows that they constitute illicit income, for the purpose o concealing and disguising the illicit origin of the goods, to evade from the legal consequences of these actions, as well as to conceal, disguise the nature, origin, location, disposition, transmission, movement of the real property of the goods or related rights by a person who knows that they are illicit income)*.

I consider the judgment of the substantive court in this case unfounded because of the wrong requalification of Ilan Shor's actions based on the provisions of art. 196 paragraph (4) of the Criminal Code.

The accusation was based on evidence obtained legally in the criminal prosecution, the defendant's guilt being proven with the correct classification of his actions, and the judge, contrary to the provisions of art. 101 Code of criminal procedure, did not assess the evidence from the point of view of their corroboration, taking the unfounded conclusions of the defense party.

The court found in the judgment that the unlawful acts which are not directed to appropriation but to the temporary use of the goods do not form a component of theft. The temporary use of the goods was appreciated by the court considering the fact that the perpetrator did not pursue the goal of greed, because he did not want to pass the goods in his definitive possession.

In this sense the court mentioned that although the objective side of the offenses provided for in art. 190 and art. 196 of the Criminal Code contains common elements such as the deception and abuse of trust and the consequences of these actions are related to causing the material damage to the owner, however they differ from each other. Among the criteria for delimiting the named offenses, the court noted that, in case of the offense provided for by art. 196 of the Criminal Code, the perpetrator does not obtain possession of any concrete goods of the victim, but fraudulently avoids to transmit the goods to him that belong to him or uses them to the detriment of the victim. The offense provided by art. 196 of the Criminal Code, does not imply the taking of the goods from victim's possession, because otherwise it would fall under art. 190 of the Criminal Code.

Under these conditions, although the court correctly made the distinction between: the criminal components provided by art. 190 and art.196, it did not take into account all the evidence as a whole, in terms of their corroboration.

Thus, no evidence from the file verifies Ilan Shor's intention to use the assets of CB "Banca de Economii" SA to the detriment of the financial institution, or fraudulently avoid to transmit the financial funds that are not due to him, but only the statements of the defendant that should be critically appreciated, being submitted with the purpose of commuting their punishment in the respective criminal case, and again being confirmed by other evidence present in the file.

Therefore, if we are to analyze the attributes of the ownership right (art. 315 par .(1) Civil code - possession, use and disposition), then Ilan Shor in his capacity as a member of the Board of

'Banca de Economii' SA has obtained under the influence of deception and abuse of trust the financial means in the amount of **5,291,708,829.71 lei MDL**, transmitted voluntarily by the financial institution and in no case only used its assets.

Ilan Shor's actions were not only materialized by the use of the financial means belonging to CB "Banca de Economii" SA, but also by their possession on the accounts of the companies belonging to the defendant (a fact that results from his statements), after which the attribute of ownership was also realized the disposition of the financial means acquired illegally, by transferring them to the non-resident companies.

In this respect, the Plenary of the Supreme Court of Justice comes with an explanation through the Decision *On the judicial practice in the criminal proceedings regarding the theft of goods* no. 23 of 06.28.2004, according to which the fraud is considered consummated from the moment the perpetrator, entering into the illegal possession of goods of another person, obtains the real possibility of using them and disposing of them at his will.

Therefore, the factual elements acquired in the criminal proceedings, establish with certainty the consummation of the fraud from the moment Ilan Shor obtained a possibility to use the financial means acquired fraudulently, and moreover he disposed of them at will by transferring from the accounts of the companies belonging to them, to other non-resident companies.

Moreover, even if hypothetically we admitted the re-qualification made by the court in the contested judgment regarding Ilan Shor's intention only to use temporarily the money belonging to CB "Banca de Economii" SA, then materials of the criminal case do not have any annexed evidence that would establish the defendant's desire to return the illegally obtained money, should V. Filat and V. Platon return them, a fact that proves once again the wrong re-qualification by the court in this sense.

Also the court emphasized that during the hearing the specific subjective side of the criminal offense provided for in art. 190 of the penal code was not demonstrated, as it lacks the direct intention and a special goal provided by the incriminated norm, the goal of theft.

In fighting the court's arguments, it is necessary to examine in detail the procedure for offering the loans to the companies "VOXIMAR COM" LLC, f.c.-1013600015933, "DRACARD" LLC f.c.-1013600020401, "PROVOLIROM" LLC f.c.-1013600020353 and "CARITAS GROUP" LLC as well as the purpose of payment when granting the respective loans (being presented in this way and indicated only in fictitious documents), which denotes the direct intention of the perpetrator not only to use temporarily the financial means of CB "Banca de Economii" SA, but also to own them and, finally, to dispose of them at will, for the sake of greed. Thus, Ilan Shor realized the prejudicial character of the illicit acquisition of assets of another person, as he resorted to deception and abuse of trust and expected prejudicial consequences manifested in causing the damages to CB "Banca de Economii" SA in very large proportions, knowingly wishing to inflict them, because he pursued a special goal, namely that of greed.

The argument of the court regarding the restitution by the companies affiliated to the defendant Ilan Shor of the amount of 2,575,769,144 MDL to CB "Banca de Economii" SA, from

**MOTION EXHIBIT 1_PAGE_034**

the total amount of damage indicated in the indictment in the amount of **5,291,708,829.71 MDL** cannot be taken into consideration. In other words, statements of the representative of the civil party denote the opposite, describing the fictitious loan closure by "Caritas Group" LLC with the money coming from the Banca Sociala which at that time did not have liquid financial means but operated with virtual money, respectively the loan to the company "Caritas Group" LLC which was granted on 11.25.2014 is reinstated as debt to the bank.

Moreover, according to the report of the Kroll company, the real resources that were stolen   during the period 11.04.2014—11.25.2014 was the amount of 5 billion lei, as a result of providing loans to the companies "VOXIMAR COM" LLC f.c.-1013600015933, "DRACARD" LLC f.c.-1013600020401, "PROVOLIROM" LLC f.c.-1013600020353 and "CARITAS GROUP" LLC f.c.-1012600033082., by Banca de Economii SA, and not the amount of 2,715,939,685.71 MDL, which was deducted by the court from the statements of the specialist Ruslan Grate, who referred to the period from 11.04.14 till 11.29.14, and not the period from 11.04.14 till 11.25.14, as expressly indicated in the indictment of Ilan Shor.

During the period 11.26-29.14, the banking transactions that took place within the three banks "Banca de Economii" SA, CB "Banca Sociala" SA and CB "Unibank" SA, were fictitious, i.e. they were not real, a fact confirmed both in the KROLL company report and by a specialist from the National Bank of Moldova who was also heard, Matei Dohotaru.

At the same time, the court correctly found that through intentional actions of Ilan Shor and through social connections regarding the source and the illegal origin, as well as correct circulation of the financial means in financial operations (*offense provided in art. 243 paragraph (3) letter b) of the Criminal Code*), however, the material object of the crime constitutes the amount of **MDL 5,291,708,829.71**, and not MDL 2,715,939,685.71 as stated in the arguments above.

Similarly, in establishing the sentence, the court did not take into account the social resonance, as a result of the crimes mentioned above by Ilan Shor. The devaluation of the financial means within CB "Banca de Economii" SA has become a major concern at the national level as well as in the international community.

Considering that this kind of illegal activity is very widespread, the substantive court upon giving the sentence did not grant an objective assessment of the circumstances of committing the indicated crimes. In this case, the court did not impose on the defendant a proportionate punishment for committed violations, which will contribute to a growing feeling of distrust among the citizens, namely that they cannot benefit from adequate protection from the state, and the offenders will become confident that they will have a more lenient punishment for offenses of this kind, which would contradict the purpose of punishment provided by art. 61 paragraph (2) of the Criminal Code, according to which: *"A punishment is aimed at restoring social equity, correcting the convicted person, as well as preventing commission of new offenses by both the convicts and other persons"*. Thus, establishing a main sentence of imprisonment for 7 years and 6 months, through the partial cumulation of penalties set out in art. 196 paragraph (4) and 243 paragraph (3) letter b) of the Criminal Code, the main goal was not achieved, namely prevention of committing new crimes by the defendant, as well as by other persons.

The substantive court appreciated certain circumstances in committing the offenses, but the established punishment was not assessed in conjunction with the committed acts and its consequences, it did not take into account the character and the degree of social danger of the crimes committed.

Thus, the court ignored the provisions of art. 75 of the Criminal code, according to which the person found guilty of committing an offense is punished with a fair punishment within the limits set in the special part of the Criminal Code and in strict accordance with the provisions of the general part of this code.

In accordance with the provisions of the Criminal Code, in establishing the punishment, the personality of the accused is taken into account in case of mitigating circumstances, related to the goal, reasons, the role of the accused and his behavior before commission of the crime, during and after committing it.

Under these circumstances, the decision of the substantive court should be reversed also under the aspect of the leniency of applied punishment because in this case there are no exceptional circumstances, the defendant will not understand the consequences of violation of the law and in such circumstances, by applying a sentence of only 6 years imprisonment for commission of offense provided in art. 243 par. (3) letter b) of the Criminal Code, the goal of criminal punishment will not be reached.

The state accusation calls for partial reversal of the sentence and application of the definitive punishment for cumulative crimes by the total aggregation of punishments applied to Shor Ilan Miron of 19 years of imprisonment with deprivation of the right to occupy certain functions in the banking system for a term of up to 5 years, because application of a more lenient punishment within the limits established in the articles incriminated to Ilan Shor is not equitable in relation to the circumstances of the act, the consequences and gravity of crimes.

At the same time, the court has unfoundedly admitted the civil case only in principle, following that the amount of due compensations to be decided by a civil court, making reference to art. 387 paragraph (3) Code of criminal procedure. In other words, in this case, the exceptional cases referred to by the judge are not present. Once the damage has been identified, according to the provisions of art. 225 paragraph (2) Code of criminal procedure, the judge was obliged to solve the civil action by admitting it.

In such circumstances, I believe that the substantive court gave a hasty and unfounded judgment, in which the motivation of the solution contradicts the operative part of the resolution, and the sentence in question is against the law, which is why it should be appealed and the defendant Ilan Shor should be convicted of committing the offenses provided in art. 190 paragraph, (5) and 243 paragraph (3) letter b) of the Criminal Code.

Based on the above, pursuant to the provisions of art. 53 paragraph (1) p. 9), 400, 401 par. (1) p.1), 402, 405, -

**ASK TO:**

1. Admit the appeal.
2. Partially reverse the sentence of the Chisinau court, Buiucani office dated 06.21.2017, and give a new decision, in a manner provided for the first court, and:
a) Find Shor Ilan Miron guilty, birth date 03.06.1987 of committing a crime provided for in art.190 par. (5) Criminal code, and apply a punishment in the form of imprisonment for a term of 13 years

**MOTION EXHIBIT 1_PAGE_036**

with deprivation of the right to hold certain functions in the banking system for a term of up to 5 years;

b) Acknowledge Shor Ilan Miron guilty, birth date 03.06.1987 of committing an offense provided for in art.243 paragraph (3) letter b) of the Criminal Code and apply a punishment in the form of imprisonment for a term of 8 years;

c) Establish a definitive sentence for cumulative crimes through the partial cumulation of punishments applied to Shor Ilan Miron of 19 years of imprisonment with deprivation of the right to occupy certain functions in the banking system for a term of up to 5 years;

d) Collect from the defendant Ilan Shor for the benefit of the civil party "Banca de Economii" SA, on the account for accumulation of financial means no.MD24NB00000000003535260601, financial means in the amount of the damage caused by the offense in the amount of 5,291,708,829.71 lei MDL, from the value of assets and income belonging to the defendant.

e) Collect in the account of the General Prosecutor's Office the judicial expenses in the amount of 42,483.84 lei.

Appendix: three copies of the appeal on 6 pages.


07.28.2017


**Prosecutor in
the Anti-corruption Prosecutor's Office**          [signature]          **Andrei BAEŞU**


**MOTION EXHIBIT 1_PAGE_037**

Case 1:23-cr-10036-WDM Document 171 Filed 06/05/22 Page 39 of 81 PageID #758



**Procuratura Republicii Moldova**
# Procuratura Anticorupție

Republica Moldova, MD - 2004,mun. Chișinău, bdul Ștefan cel Mare, 198
tel. (+373 22) 257-401, fax (+373 22) 257-361, e-mail: proc-ant@procuratura.md

28.07.2017 nr. 01-17A-18/17-7823

Curtea de apel Chișinău

# A P E L

declarat de către procurorul în Procuratura
Anticorupție Andrei Baeșu, împotriva
sentinței Judecătoriei Chișinău, sediul
Buiucani din 21.06.2017 în privința
inculpatului Șor Ilan Miron

CONSILIUL SUPERIOR AL MAGISTRATURII
JUDECĂTORIA CHIȘINĂU
SEDIUL BUIUCANI
Intrare Nr. 20764

### Motivele apelului
### (sentință neîntemeiată)

Prin sentința Judecătoriei Chișinău, sediul Buiucani din 21.06.2017 cet. Șor Ilan Miron, a.n. 06.08.1987, a fost recunoscut vinovat în comiterea infracțiunilor prevăzute de art. 196 alin. (4) și 243 alin.(3) lit. b) Cod penal, fiindu-i stabilită o pedeapsă definitivă prin cumul parțial a pedepselor de 7 ani și 6 luni închisoare.

Ilan Șor a fost pus sub învinuire pentru faptul că abuzînd de încrederea persoanelor responsabile din cadrul instituției financiare „Banca de Economii" SA care aveau obligația de a primi și verifica cererea de solicitare a creditelor și a tuturor actelor care se impuneau a fi colectate de la persoane fizice și juridice, fiind în înțelegere prealabilă cu alți factori de decizie din cadrul băncii, urmărind intenția de însușire a mijloacelor financiare ce aparțin BC „Banca de Economii" SA, a dobîndit ilicit mijloacele financiare din bancă prin intermediul companiilor fondate de către acesta în mod intenționat pentru a fi implicate în asemenea operațiuni bancare, precum „VOXIMAR COM" S.R.L., c.f. 1013600015933, „DRACARD" S.R.L., c.f. 1013600020401, „PROVOLIROM" S.R.L. c.f. 1013600020353 și „CARITAS GROUP" S.R.L. c.f. 1012600033082, creînd aparența unor persoane juridice cu capacitatea de administrare și gestionare corespunzătoare, precum și creînd aparența legalității cererii de creditare și oportunitatea de acordare a creditului, care în rezultatul acțiunilor sale infracționale a prejudiciat banca cu suma de **5 291 708 829,71 lei** MDL*(infracțiune prevăzute la art. 190 alin.(5) Cod penal - escrocherie, caracterizată prin dobîndirea ilicită a bunurilor altei persoane, prin înșelăciune și abuz de încredere, cu folosirea situației de serviciu, săvîrșită în proporții deosebit de mari).*

**MOTION EXHIBIT 1_PAGE_039**

Oricum, în vederea atingerii scopului său infracţional şi anume de atribuire unui aspect legal sursei şi provenienţei veniturilor ilicite în sumă totală de **5 291 708 829,71 lei** MDL, precum şi tăinuirea originii sau apartenenţei unor astfel de venituri a comis multiple acţiuni infracţionale identice, alcătuind în ansamblu acţiuni de spălare a banilor(art.243 alin.(3) lit.b) din Cod penal - *spălarea de bani, caracterizată prin convertirea şi transferul bunurilor de către o persoană care ştie că acestea constituie venituri ilicite, în scopul de a tăinui şi de a deghiza originea ilicită a bunurilor, de a se sustrage de la consecinţele juridice ale acestor acţiuni, precum şi tăinuirea, deghizarea naturii, originii, amplasării, dispunerii, transmiterii, deplasării proprietăţii reale a bunurilor ori a drepturilor aferente de către o persoană care ştie că acestea constituie venituri ilicite).*

Sentinţa instanţei de fond o consider în cazul dat neîntemeiată din motivul recalificării greşite a acţiunilor lui Ilan Şor în baza prevederilor art. 196 alin.(4) Cod penal.

Acuzarea s-a bazat pe probe obţinute legal în cadrul urmăririi penale, fiind probată vinovăţia inculpatului cu încadrarea corectă a acţiunilor acestuia, iar judecătorul, contrar prevederilor art. 101 Cod de procedură penală, nu a apreciat probele din punct de vedere al coroborării lor, preluând concluziile nefondate ale părţii apărării.

Instanţa de judecată a constatat în sentinţă precum că nu formează componenţă de sustragere faptele ilegale care sunt îndreptate nu spre însuşirea ci spre folosinţa temporara a bunurilor. Folosinţa temporara a bunurilor instanţa a apreciat-o ţinând seama că făptuitorul nu a urmărit scopul de cupiditate, deoarece nu a dorit sa treacă bunurile în stăpânirea lui definitivă.

În sensul dat instanţa a menţionat că deşi latura obiectivă a infracţiunilor prevăzute de art. 190 şi art.196 din Codul penal conţine elemente comune ca înşelăciunea şi abuzul de încredere şi urmările acestor acţiuni sunt în legătura cu cauzarea prejudiciului material proprietarului, totuşi acestea se deosebesc una de alta. Printre criteriile de delimitare a infracţiunilor nominalizate, instanţa a reţinut că, în cazul infracţiunii prevăzute de art.196 din Codul penal, făptuitorul nu obţine în posesie careva bunuri concrete ale victimei, ci se eschivează în mod fraudulos să-i transmită acesteia bunuri care i se cuvin ori se foloseşte de ele în detrimentul victimei. Infracţiunea prevăzuta de art.196 din Codul penal, nu presupune luarea din posesia victimei a bunurilor, deoarece în caz contrar aceasta ar cade sub incidenta art.190 din Codul penal.

În condiţiile expuse, deşi instanţa corect a făcut delimitarea dintre componenţele de infracţiune prevăzute de art. 190 şi art.196, aceasta nu a luat în consideraţie toate probele în ansamblu, din punct de vedere al coroborării lor.

Astfel, nici o probă din dosar nu adevereşte intenţia lui Ilan Şor de a se folosi de bunurile BC "Banca de Economii" SA în detrimentul instituţiei financiare, sau eschivarea în mod fraudulos de a-i transmite mijloacele financiare ce nu i se cuvin, decît doar declaraţiile inculpatului, care urmează a fi apreciate critic, fiind depuse cu scopul de a-şi uşura pedeapsa în cauza penală respectivă, fără a fi confirmate prin celelalte probe prezente la dosar.

Prin urmare, dacă e să analizăm atributele dreptului de proprietate(art. 315 alin.(1) Cod civil - *posesiunea, folosinţa şi dispoziţia)*, atunci Ilan Şor în calitatea sa

de membru al Consiliului Băncii de Economii SA a obținut sub influența înșelăciunii și a abuzului de încredere mijloacele financiare în sumă de 5 291 708 829.71 lei MDL, transmise în mod benevol de către instituția financiară și în nici un caz nu s-a folosit doar de bunurile acesteia.

Acțiunile lui Ilan Șor nu s-au materializat doar prin folosirea mijloacelor financiare ce aparțin BC "Banca de Economii" SA, ci și prin posesia acestora pe conturile companiilor ce aparțin inculpatului (fapt ce rezultă din declarațiile acestuia), după care s-a realiza și atributul proprietarului de dispoziție asupra mijloacelor financiare dobândite ilicit, prin transferul acestora către companiile nerezidente.

În acest sens vine cu o explicație și Plenul Curții Supreme de Justiție prin Hotărîrea *Cu privire la practica judiciară în procesele penale despre sustragerea bunurilor* nr. 23 din 28.06.2004, potrivit căreia escrocheria se consideră consumată din momentul în care făptuitorul, intrînd în posesia ilegală asupra bunurilor altei persoane, obține posibilitatea reală de a se folosi și a dispune de acestea la dorința sa.

Prin urmare, elementele de fapt dobândite în cadrul procesului penal, stabilesc cu certitudine consumarea infracțiunii de escrocherie din momentul în care Ilan Șor a obținut posibilitatea de a se folosi de mijloacele financiare dobândite în mod fraudulos, ba mai mult a și dispus de acestea la dorința sa prin transferul de la conturile companiilor ce-i aparțin, către alte companii nerezidente.

Mai mult ca atît, chiar dacă în mod ipotetic am fi admis recalificarea efectuată de către instanță în sentința contestată, privind intenția lui Ilan Șor doar de a se folosi temporar de banii ce aparțin BC "Banca de Economii" SA, atunci la materialele cauzei penale nu este anexată nici o probă care ar stabili dorința inculpatului de a restitui banii obținuți ilegal, la eventuala returnare a acestora de către V. Filat și V. Platon, fapt ce atestă încă o dată recalificarea greșită a instanței în sensul dat.

La fel, instanța a subliniat faptul că în ședința de judecată nu s-a demonstrat latura subiectivă specifică componenței de infracțiune prevăzute la art. 190 din codul penal, întrucât lipsește intenția directă și scopul special prevăzut de norma incriminată, scopul de sustragere.

În combaterea argumentelor instanței, necesită a fi examinată în detaliu procedura de oferire a creditelor companiilor "VOXIMAR COM" S.R.L.c.f. 1013600015933, "DRACARD" S.R.L. c.f.-1013600020401, "PROVOLIROM" S.R.L. c.f.-1013600020353 și "CARITAS GROUP" S.R.L. precum și destinația plății la acordarea creditelor respective(fiind prezentate în sensul dat și indicate doar înscrisuri fictive), care denotă intenție directă a făptuitorului nu doar de a se folosi temporar de mijloacele financiare ale BC "Banca de Economii" SA, ci și de a le poseda și, într-un final, a dispune de ele după bunul plac, fiind urmărit în scopul de cupiditate. Astfel, Ilan Șor a conștientizat caracterul prejudiciabil al dobîndirii ilicite a bunurilor altei persoane, întrucât a apelat la înșelăciune și abuz de încredere și a prevăzut urmările prejudiciabile manifestate în cauzarea de daune BC "Banca de Economii" SA în proporții deosebit de mari, dorind în mod conștient survenirea acestora, deoarece a urmărit un scop special, și anume cel de cupiditate.

Nu poate fi luat în considerație nici argumentul instanței privind restituirea de către firmele afiliate inculpatului Ilan Șor a sumei de 2 575 769 144 MDL către BC

învinuire în sumă de **5 291 708 829,71 lei** MDL. Or, declaraţiile reprezentantului părţii civile denotă contrariul, fiind descrisă fictivitatea închiderii creditului de către „Caritas Group" SRL cu banii care provin de la Banca Socială care în acea perioadă nu avea mijloace financiare lichide ci a operat cu bani virtuali, respectiv creditul companiei „Caritas Group" SRL care a fost acordat pe 25.11.2014 este restabilit ca datorie faţă de bancă.

Mai mult ca atît, potrivit raportului companiei Kroll, mijloacele reale care au fost sustrase pe perioada 04.11.2014-25.11.2014, este în sumă de 5 mlrd lei, ca urmare a creditării companiilor „VOXIMAR COM" S.R.L.c.f.-1013600015933, „DRACARD" S.R.L. c.f.-1013600020401, „PROVOLIROM" S.R.L. c.f.-1013600020353 şi „CARITAS GROUP" S.R.L. c.f.-1012600033082., de către Banca de Economii SA, şi nu suma de 2 715 939 685, 71 MDL, care a fost dedusă de către instanţă din declaraţiile specialistului Ruslan Grate, ce s-a referit la perioada 04.11.14-29.11.14, şi nu perioada din 04.11.14-25.11.14, aşa cum este indicat expres în actul de învinuire a lui Ilan Şor.

În perioada 26-29.11.14, tranzacţiile bancare care au avut loc în cadrul celor trei bănci „Banca de Economii" SA, BC,,Banca Socială" SA şi BC „Unibank" SA, au fost fictive, adică nu au fost reale, fapt confirmat atît în raportul companiei KROLL cît şi de către specialistul care a fost audiat din cadrul Băncii Naţionale a Moldovei, Matei Dohotaru.

Totodată, instanţa corect a constatat atingerea prin acţiunile intenţionate a lui Ilan Şor a relaţiilor sociale cu privire la sursa şi provenienţa licită, precum şi la circulaţia corectă în operaţiunile financiare a mijloacelor băneşti(*infracţiune prevăzută la art. 243 alin.(3) lit. b) Cod penal*), însă obiectul material al infracţiunii constituie suma de **5 291 708 829,71 lei** MDL, şi nu 2 715 939 685,71 MDL reieşind din argumentele indicate mai sus.

La fel, la stabilirea pedepsei, instanţa nu a luat în consideraţie rezonanţa socială, în rezultatul comiterii infracţiunilor indicate supra de către Ilan Şor. Devalizarea mijloacelor financiare din cadrul BC "Banca de Economii" SA a devenit o preocupare principală la nivel naţional cît şi a comunităţii internaţionale.

Luînd în consideraţie că acest gen de activitate ilegală este foarte răspîndit, instanţa de fond la emiterea sentinţei nu a acordat aprecierii obiective a circumstanţelor comiterii infracţiunilor nominalizate. În cazul dat instanţa nu i-a aplicat inculpatului o pedeapsă proporţional încălcărilor admise, fapt prin care va contribui la dezvoltarea în rîndul cetăţenilor a sentimentului de neîncredere şi anume că nu pot beneficia de o protecţie adecvată din partea statului, iar infractorii vor deveni încrezători în faptul că vor fi pedepsiţi mai blînd pentru infracţiunile de genul dat, fapt ce ar contravine scopului pedepsei prevăzut de art. 61 alin.(2) Cod penal, conform căruia:,, *Pedeapsa are drept scop restabilirea echităţii sociale, corectarea condamnatului, precum şi prevenirea săvîrşirii de noi infracţiuni atît din partea condamnaţilor, cît şi a altor persoane*". Astfel, stabilind o pedeapsă principală de închisoare de 7 ani şi 6 luni, prin cumul parţial al pedepselor fixate la art. 196 alin. (4) şi 243 alin.(3) lit. b) Cod penal, nu a fost atins scopul principal şi anume prevenirea de comitere de noi infracţiuni de către inculpat, precum şi de către alte persoane.

**MOTION EXHIBIT 1_PAGE_042**

Instanța de fond justificat a apreciat anumite circumstanțe la comiterea infracțiunilor, dar pedeapsa stabilită nu a fost apreciată în coroborare cu faptele comise și consecințele acesteia, nu a ținut cont de caracterul și gradul de pericol social al infracțiunilor săvîrșite.

Astfel, instanța de judecată a ignorat prevederile art. 75 Cod penal, conform cărora persoanei recunoscute vinovate de săvîrșirea unei infracțiuni i se aplică o pedeapsă echitabilă în limitele fixate în partea specială a Codului penal și în strictă conformitate cu dispozițiile părții generale a acestui cod.

În conformitate cu prevederile Codului penal, la stabilirea pedepsei se ia în considerație personalitatea vinovatului în cazul existenței circumstanțelor atenuante, legate de scopul, motivele, rolul vinovatului și comportamentul acestuia pînă la săvîrșirea infracțiunii, în timpul și după săvîrșirea acesteia.

În condițiile expuse, decizia instanței de fond este pasibilă de a fi casată și sub aspectul blîndeții pedepsei aplicate deoarece în cauză nu sînt prezente circumstanțe excepționale, inculpatul nu v-a conștientiza consecințele încălcării legii și în atare împrejurări, prin aplicarea pedepsei de doar 6 ani închisoare pentru săvîrșirea infracțiunii prevăzute la art. 243 alin.(3) lit. b) Cod penal, nu se va atinge scopul pedepsei penale.

Acuzarea de stat solicită casarea parțială a sentinței și aplicarea pedepsei definitive pentru concurs de infracțiuni prin cumul total al pedepselor aplicate față de Șor Ilan Miron în mărime de 19 ani de închisoare cu privarea de dreptul de a ocupa anumite funcții în sistemul bancar pe un termen de pînă la 5 ani, deoarece aplicarea unor pedepse mai blânde din limitele stabilite la articolele incriminate lui Ilan Șor nu este echitabilă în raport cu circumstanțele faptei, consecințele și gravitatea infracțiunilor.

Totodată, instanța în fond neîntemeiat a admis doar în principiu acțiunea civilă, urmînd ca asupra cuantumului despăgubirilor cuvenite să hotărască instanța civilă, făcînd referire la art.387 alin.(3) Cod de procedură penală. Or, în situația respectivă nu sunt prezente cazurile excepționale la care face referire judecătorul. Odată ce a fost identificat prejudiciul, potrivit prevederilor art. 225 alin.(2) Cod de procedură penală, judecătorul era obligat să soluționeze acțiunea civilă prin admiterea acesteia.

În astfel de circumstanțe, consider că instanța de fond a pronunțat o hotărîre pripită și neîntemeiată, în care motivarea soluției contrazice dispozitivul hotărîrii, iar sentința în cauză este contrară legii, de aceea ea urmează a fi casată și inculpatul Ilan Șor să fie declarat vinovat de comiterea infracțiunilor prevăzute de art. 190 alin.(5) și 243 alin.(3) lit. b) Cod penal.

Reieșind din cele expuse, conducîndu-mă de prevederile art. 53 alin. (1) p. 9), 400, 401 alin. (1) p. 1), 402, 405, -

## S O L I C I T:

1. Admiterea apelului.
2. Casarea parțială a sentinței judecătoriei Chișinău, sediul Buiucani din 21.06.2017 cu pronunțarea unei noi hotărîri, potrivit modului prevăzut pentru prima instanță, și:
   a) A recunoaște vinovat pe Șor Ilan Miron, a.n. 06.03.1987 de comiterea infracțiunii prevăzute la art. 190 alin. (5) Cod penal, aplicîndu-i o pedeapsă

**MOTION EXHIBIT 1_PAGE_043**

184

sub formă de închisoare pe un termen de 13 ani cu privarea de dreptul de a ocupa anumite funcții în sistemul bancar pe un termen de pînă la 5 ani;

b) A recunoaște vinovat pe Şor Ilan Miron a.n. 06.03.1987 de comiterea infracțiunii prevăzute la art.243 alin.(3) lit. b) Cod penal aplicîndu-i o pedeapsă sub formă de închisoare pe un termen de 8 ani;

c) A stabili o pedeapsă definitivă pentru concurs de infracțiuni prin cumul parțial al pedepselor aplicate față de Şor Ilan Miron în mărime de 19 ani de închisoare cu privarea de dreptul de a ocupa anumite funcții în sistemul bancar pe un termen de pînă la 5 ani;

d) A încasa de la inculpatul Ilan Şor în folosul părții civile „Banca de Economii" SA, pe contul de acumulare a mijloacelor financiare nr. MD24NB000000000035260601, mijloace financiare în valoarea prejudiciului cauzat prin infracțiune în sumă de 5 291 708 829,71 lei lei MDL, din valoarea bunurilor și veniturilor ce aparțin inculpatului.

e) A încasa în contul Procuraturii Generale a cheltuielilor judiciare în sumă de 42 483,84 lei.

Anexă: copii ale apelului în trei exemplare pe 6 file.

28.07.2017

**Procuror în**
**Procuratura Anticorupție**



**Andrei BAEŞU**



STATE OF NEW YORK          )
                           )
                           )     ss
COUNTY OF NEW YORK         )

**<u>CERTIFICATION</u>**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Romanian into English of the attached Declaration of Aureliu

Colenco.

_____
Laura Musich, Managing Editor
Lionbridge

Sworn to and subscribed before me

this __7th__ day of __June__, 20 __23__.

ETHAN WIN LY
NOTARY PUBLIC-STATE OF NEW YORK
No. 01LY6323702
Qualified in New York County
My Commission Expires 04-27-2027

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| **IN RE APPLICATION OF ILAN SHOR FOR AN ORDER DIRECTING DISCOVERY FROM MATEI DOHOTARU PURSUANT TO 28 U.S.C. § 1782** | **Case No. _____** |

## DECLARATION OF AURELIU COLENCO IN SUPPORT OF
## ILAN SHOR'S PETITION FOR DISCOVERY
## IN AID OF A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. §
## 1782

Mr. Aureliu Colenco hereby declares, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following statements are true and correct:

1. My name is Aureliu Colenco. I am a lawyer practicing in the Republic of Moldova. I have been admitted to practice before the Courts of Moldova since April 1, 2015, with the license number 2806. I maintain my legal offices at 22 Mihail Kogalniceanu Street, Chisinau, Republic of Moldova. I have personal knowledge of the information provided in this Declaration, except where I note that certain information has been communicated to me by others. All of the information stated herein is true to the best of my knowledge and belief.

2. I am advised and understand that this Declaration will be submitted with a Petition for Discovery in Aid of a Foreign Proceeding pursuant to 28 U.S.C. § 1782 ("**the Petition**"), and that the Petition will be submitted to a United States Court on behalf of Mr. Ilan Shor. I am further advised and understand that the Petition will ask the United States Court to compel the production of documents and testimony from Mr. Matei Dohotaru.

3. Since approximately April 1, 2020, I have acted as legal counsel for Mr. Shor in criminal proceedings in Moldova.

1

[signature] [stamp:] COLENCO AURELIU / REPUBLIC OF MOLDOVA / UNION OF LAWYERS / LAW FIRM / COLENCO AURELIU / T/C 44819029 / CHISINAU / BAR ASSOCIATION

## MOTION EXHIBIT 1_PAGE_046

4. Mr. Shor is a prominent businessman and politician in Moldova. Mr. Shor is the leader of the Shor Party, which is currently a minority opposition political party in Moldova. From approximately July 2015 to April 2019, Mr. Shor served as the Mayor of Orhei, which is the administrative center of the Orhei District in Moldova. In March 2019, Mr. Shor became a member of the Parliament of the Republic of Moldova, a position he held until 04.27.2023, when the current parliamentary majority adopted a decision declaring that Mr. Shor's mandate as a member of the Parliament of the Republic of Moldova had been terminated by law and declared vacant, namely in connection with his conviction on 04.13.2023 by the Chisinau Court of Appeal (as described further below).

### *Criminal proceedings against Mr. Shor in Moldova*

5. In 2016, the Moldovan Anti-Corruption Prosecutor's Office charged Mr. Shor with fraud pursuant to art. 190(5) of the Moldovan Criminal Code and money laundering pursuant to art. 243(3) of the Moldovan Criminal Code. In the underlying investigation and the trial before the court of first instance – the Chisinau Court, Buiucani Division, Mr. Dohotaru was the prosecution's main witness against Mr. Shor.

6. On June 21, 2017, the Chisinau Court issued a judgment that acquitted Mr. Shor of fraud pursuant to art. 190(5) of the Moldovan Criminal Code but found him guilty of causing material damage through deception or abuse of trust pursuant to art. 196(4) of the Moldovan Criminal Code and money laundering pursuant to art. 243(3) of the Moldovan Criminal Code ("**the Judgment**").

7. The court of first instance rested its guilty verdict largely on Mr. Dohotaru's testimony, which is contested by Mr. Shor in numerous key respects. Among other things, Mr. Dohotaru alleged in his witness statement that companies connected to Mr. Shor were involved in fictitious banking transactions to conceal bank fraud, allegations the court of first instance accepted in the Judgment. Mr. Shor, both at the court of first instance and in his appeal, has contested the factual basis for Mr. Dohotaru's statement, as well as Mr. Dohotaru's credibility as a witness.

[signature] [stamp:] COLENCO AURELIU / REPUBLIC OF MOLDOVA / UNION OF LAWYERS / LAW FIRM / COLENCO AURELIU / T/C 44819029 / CHISINAU / BAR ASSOCIATION

**MOTION EXHIBIT 1_PAGE_047**

8. On July 28, 2017, the Anti-Corruption Prosecutor's office commenced an appeal against the Judgment. On July 31, 2017, Mr. Shor commenced an appeal against the Judgment in the Cahul Court of Appeal, which was later moved to the Chisinau Court of Appeal.

9. Under Moldovan criminal law and procedure, the Court of Appeal may re-hear all the evidence that was presented in the court of first instance, as well as fresh evidence. Moreover, a criminal defendant may submit new exculpatory evidence for a court's consideration at any stage of the proceedings, or even after the proceedings have concluded.

10. Accordingly, on behalf of Mr. Shor, my co-counsel and I sought the testimony of Mr. Dohotaru for use in the proceedings before the Court of Appeal. Specifically, on or about July 7, 2021, we filed a request that a hearing be ordered for the prosecution witness Matei Dohotaru and that the Court summon him to appear at the hearing with the Cahul Court of Appeal.

11. On or about August 20, 2021, the Moldovan Supreme Court of Justice transferred Mr. Shor's appeal from the Cahul Court of Appeal to the Chisinau Court of Appeal. Under Moldovan law, the Chisinau Court of Appeal was required to restart the re-examination of evidence. In the Chisinau Court of Appeal, the prosecution requested Mr. Dohotaru as witness #1 on their witness list, which the Court approved. The prosecution then represented to the Court that Mr. Dohotaru was unavailable for live testimony, as he resided outside of Moldova in the United States.

12. Mr. Dohotaru is a witness, not a party, in the proceedings for which his evidence is sought. His statements form the basis of the alleged facts used by the prosecution in their indictment of Mr. Shor. At the Cahul Court of Appeal, before the appeal was transferred to Chisinau, the Court allowed Mr. Dohotaru's witness statements from the first instance trial to be read out. Upon information that Mr. Dohotaru was in Moldova, the Cahul Court also accepted our request for Mr. Dohotaru to appear in court. In the Chisinau Court of Appeal, the Court accepted the prosecution's witness list, including Mr. Dohotaru as the first prosecution witness. It remained the position of the

3

[signature] [stamp:] COLENCO AURELIU / REPUBLIC OF MOLDOVA / UNION OF LAWYERS / LAW FIRM / COLENCO AURELIU / T/C 44819029 / CHISINAU / BAR ASSOCIATION

prosecution's office that they were unable to produce Mr. Dohotaru for live testimony, as he lives abroad in the United States.

13. Because Mr. Dohotaru apparently resides and works in the United States, we were not able to conduct his examination in the Chisinau Court of Appeal. In my view as Mr. Shor's lead criminal defense counsel, the taking of Mr. Dohotaru's testimony for use in the criminal proceedings was of critical importance, given the central role that Mr. Dohotaru played in the trial before the court of first instance and the fresh evidence we have since obtained, which contradicts Mr. Dohotaru's witness statements and testimony.

14. Furthermore, it is my view that Mr. Dohotaru likely has potentially relevant documents in his possession. Such documents are likely to include communications with the prosecutor's office in Moldova concerning his testimony, cooperation agreements or other documents evidencing any agreement, concession, consideration, or benefit offered to him in exchange for his cooperation in providing testimony against Mr. Shor, and documents concerning alleged fraudulent banking transactions that occurred while Mr. Dohotaru held an official position with the National Bank of Moldova.

15. In addition to myself and my Moldovan colleagues, Mr. Shor has also recently (since December 2022) been represented in the criminal proceedings in Moldova by counsel from the United Kingdom, Shaul Brazil and John Binns, partners at the firm BCL Solicitors LLP in London, UK, who were admitted to the Registry of Foreign Lawyers of the Republic of Moldova in December 2022. At a hearing in Moldova on March 10, 2023, the UK counsel filed a request for additional time to be granted for the purposes of pursuing the Petition and obtaining Mr. Dohotaru's testimony. The request was rejected by the Chisinau Court of Appeal.

16. As indicated above, the appeal proceedings before the Chisinau Court of Appeal commenced in August 2021. At the hearing on March 10, 2023, after 17 months of trial, the Court of Appeal declared that the judicial inquiry (the evidential stage of the proceedings) had been completed and directed that closing submissions would be made on April 12, 2023.

[signature] [stamp:] COLENCO AURELIU / REPUBLIC OF MOLDOVA / UNION OF LAWYERS / LAW FIRM / COLENCO AURELIU / T/C 44819029 / CHISINAU / BAR ASSOCIATION

**MOTION EXHIBIT 1_PAGE_049**

17. Following the conclusion of closing submissions on April 13, 2023, on the same day, the Court of Appeal immediately retired to consider their decision and – within hours - issued a final judgment, rejecting Mr. Shor's appeal as unfounded (and/or issued out of time) and admitting the prosecution's appeal, thereby finding Mr. Shor guilty of fraud pursuant to art. 190(5) of the Moldovan Criminal Code and money laundering pursuant to art. 243(3) of the Moldovan Criminal Code. The Court sentenced Mr. Shor to 15 years' imprisonment.

18. Delivery of the reasoned decision (the Court's written judgment) affirming Mr. Shor's conviction took place on May 30, 2023. The reasoned decision is approximately 200 pages in length and a professional English translation has not yet been obtained. However, I confirm that the Court has continued to rely on Mr. Dohotaru's testimony from the first instance trial as the primary evidence against Mr. Shor.

19. Disregarding all defense arguments concerning the lack of veracity of Mr. Dohotaru's statements and requests to hear him in the court of appeal (in any of the ways provided for by the Code of Criminal Procedure), especially in the context of the fresh evidence adduced, Chisinau Court of Appeal aggravated Mr. Shor's situation by delivering a much more serious result than the one given by the first instance, without hearing the witness in question, but relying on his previous statements, which were not even read out in the prescribed manner. Notwithstanding the fact that the appeal proceedings have now concluded, and in light of the circumstances set out in this Declaration, it is my view that the taking of Mr. Dohotaru's testimony remains of key importance and particularly relevant.

### *Ordinary cassation (appeal)*

20. First, on or prior to June 30, 2023 (that is, within the statutory period of 30 days from the date of the pronouncement of the reasoned decision), my co-counsel and I will be commencing a cassation appeal with the Supreme Court of Justice of the Republic of Moldova, which constitutes the domestic court of last resort.

21. Under Article 435 of the Moldovan Code of Criminal Procedure, the Supreme Court of Justice is competent to issue one of the following decisions:

[signature] [stamp:] COLENCO AURELIU / REPUBLIC OF MOLDOVA / UNION OF LAWYERS / LAW FIRM / COLENCO AURELIU / T/C 44819029 / CHISINAU / BAR ASSOCIATION

**MOTION EXHIBIT 1_PAGE_050**

(i)  reject the appeal as inadmissible and uphold the judgment appealed, or

(ii) admit the appeal and repeal, in whole or in part, the judgment appealed by:

- upholding the judgment of the court of first instance where the appeal is deemed to have been erroneously admitted,
- acquit the defendant or terminate the criminal proceedings against him,
- re-hear the case and deliver a new judgment, or order that the case be re-heard by the Court of Appeal if a judicial error cannot be remedied by the Supreme Court of Justice.

22. In principle, the Supreme Court of Justice rules primarily on matters of law and is not generally a court of fact. However, fresh evidence may still be introduced at this stage if that evidence was not known to the defendant, or the defendant did not have access to that evidence before the Court of Appeal issued its verdict.

23. In the circumstances of the present case, the taking of Mr. Dohotaru's testimony is necessarily contingent on the granting of the Petition. As such, Mr. Shor did not have access to this evidence during the proceedings before the Court of Appeal and will be entitled to introduce it, once obtained, before the Supreme Court of Justice.

24. Against that backdrop, it is my view that the testimony and documents obtained from Mr. Dohotaru may still be introduced and evaluated in the criminal proceedings against Mr. Shor, either before the Supreme Court of Justice or the Court of Appeal (should the Supreme Court of Justice order that the case be re-heard by the Court of Appeal).

*Extraordinary means of appeal*

25. In addition to the above, the Moldovan Code of Criminal Procedure provides for extraordinary means of appeal – "cassation for annulment" and "review of criminal proceedings", which may be brought in respect of irrevocable judgments (i.e., where all ordinary means of appeal have been exhausted). An extraordinary appeal in favor of the defendant may commence at any time.

6

[signature] [stamp:] COLENCO AURELIU / REPUBLIC OF MOLDOVA / UNION OF LAWYERS / LAW FIRM / COLENCO AURELIU / T/C 44819029 / CHISINAU / BAR ASSOCIATION

**MOTION EXHIBIT 1_PAGE_051**

26. Under Article 458 of the Moldovan Code of Criminal Procedure, a "review of criminal proceedings" may be requested where new facts, unknown at the time of issuing the final irrevocable judgment, prove the defendant's innocence or that the defendant committed a lesser offence than the one for which he was convicted.

27. Under Articles 462 and 463 of the Moldovan Code of Criminal Procedure, a "review of criminal proceedings" is a *de novo* hearing of the case in accordance with rules of procedure applicable to first instance trials, including re-examination of previously admitted evidence and evaluation of fresh evidence submitted by the parties.

### *Conclusion*

28. As Mr. Shor's criminal counsel in the Moldovan criminal proceedings, I can affirm that Mr. Shor is not attempting to circumvent any applicable evidence-gathering restrictions. To the best of my knowledge, there are no rules that prohibit Mr. Shor from filing the Petition in the United States.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 6th day of June 2023 in Chisinau, Moldova.

_/s/_ [signature]
Aureliu Colenco

[stamp:] COLENCO AURELIU
REPUBLIC OF MOLDOVA
UNION OF LAWYERS
LAW FIRM
COLENCO AURELIU
T/C 44819029
CHISINAU
BAR ASSOCIATION

7

**MOTION EXHIBIT 1_PAGE_052**

**ÎN CURTEA DISTRICTUALĂ A STATELOR UNITE**

**PENTRU DISTRICTUL DE EST AL VIRGINIEI**

---

| | |
|---|---|
| **ÎN CEEA CE PRIVEȘTE CEREREA LUI ILAN SHOR DE OBȚINERE A UNEI ORDONANȚE PRIN CARE SĂ SE DISPUNĂ PREZENTAREA DE PROBE DE LA MATEI DOHOTARU ÎN CONFORMITATE CU 28 U.S.C. § 1782** | **Cauza Nr. _____** |

---

**DECLARAȚIA LUI AURELIU COLENCO ÎN SPRIJINUL PETIȚIEI LUI ILAN ȘOR PRIVIND OBȚINEREA DE PROBE ÎN SPRIJINUL UNEI PROCEDURI STRĂINE ÎN CONFORMITATE CU 28 U.S.C. § 1782**

Domnul Aureliu Colenco declară prin prezenta, sub sancțiunea de sperjur, în conformitate cu 28 U.S.C. § 1746, că următoarele declarații sunt adevărate și corecte:

1. Numele meu este Aureliu Colenco. Sunt avocat care practică în Republica Moldova. Am fost admis să exercit profesia în fața instanțelor de judecată din Republica Moldova din 1 aprilie 2015, cu numărul de licență 2806. Îmi mențin biroul de avocatură la adresa: strada Mihail Kogălniceanu 22, Chișinău, Republica Moldova. Cunosc personal informațiile furnizate în această Declarație, cu excepția cazurilor în care menționez că anumite informații mi-au fost comunicate de către alte persoane. Toate informațiile declarate în prezenta declarație sunt adevărate, după cunoștințele și convingerile mele.

2. Sunt informat și înțeleg că această Declarație va fi prezentată împreună cu o Petiție de obținere a unor probe în sprijinul unei proceduri străine în conformitate cu 28 U.S.C. § 1782 ("**Petiția**") și că Petiția va fi prezentată unei instanțe din Statele Unite în numele dlui Ilan Șor. De asemenea, sunt informat și înțeleg că Petiția va solicita instanței din Statele Unite să oblige prezentarea de documente și mărturii din partea dlui Matei Dohotaru.

3. Începând cu aproximativ 1 aprilie 2020, activez în calitate de avocat pentru dl Șor în cadrul procedurilor penale din Moldova.

**MOTION EXHIBIT 1_PAGE_054**

4. Domnul Șor este un om de afaceri și politician proeminent în Moldova. Dl Șor este liderul Partidului Șor, care este în prezent un partid politic minoritar de opoziție din Moldova. Aproximativ din iulie 2015 până în aprilie 2019, dl Șor a ocupat funcția de primar al orașului Orhei, care este centrul administrativ al raionului Orhei din Moldova. În martie 2019, dl Șor a devenit deputat în Parlamentul Republicii Moldova, funcție pe care deținut-o până la data de 27.04.2023, când actuala majoritate parlamentară a adoptat o hotărâre prin care a constatat încetarea de drept a mandatului de deputat al dlui Șor și l-a declarat vacant, anume în legătură cu condamnarea acestuia, la 13.04.2023, de către Curtea de Apel Chișinău (astfel cum este descris mai jos).

***Proceduri penale împotriva dlui Șor în Moldova***

5. În 2016, Procuratura Anticorupție a Republicii Moldova l-a acuzat pe dl Șor de fraudă în temeiul art. 190 alin. (5) din Codul penal al Republicii Moldova și de spălare de bani în conformitate cu art. 243 alin. (3) din Codul penal al Republicii Moldova. În cadrul investigației de bază și al procesului în fața instanței de judecată de primă instanță - Judecătoria Chișinău, oficiul Buiucani, dl Dohotaru a fost principalul martor al acuzării împotriva dlui Șor.

6. La 21 iunie 2017, Judecătoria Chișinău a emis o hotărâre prin care l-a achitat pe dl Șor de fraudă în temeiul art. 190 alin. (5) din Codul penal al Republicii Moldova, dar l-a găsit vinovat de cauzarea de daune materiale prin înșelăciune sau abuz de încredere în temeiul art. 196 alin. (4) din Codul penal al Republicii Moldova și de spălare de bani conform art. 243 alin. (3) din Codul penal al Republicii Moldova ("**Hotărârea**").

7. Instanța de fond și-a întemeiat verdictul de vinovăție în mare parte pe mărturia dlui Dohotaru, care este contestată de dl Șor în numeroase privințe esențiale. Printre altele, dl Dohotaru a susținut în declarația sa de martor că companiile care au legătură cu dl Șor au fost implicate în tranzacții bancare fictive pentru a ascunde frauda bancară, afirmații pe care instanța de fond le-a acceptat în hotărâre. Dl Șor, atât în instanța de fond, cât și în apelul său, a contestat baza factuală a declarației dlui Dohotaru, precum și credibilitatea dlui Dohotaru în calitate de martor.

2

8. La 28 iulie 2017, Procuratura Anticorupție a formulat un recurs împotriva Hotărârii. La 31 iulie 2017, dl Șor a depus un recurs împotriva Hotărârii la Curtea de Apel Cahul, care ulterior a fost transferat la Curtea de Apel Chișinău.

9. În conformitate cu legislația și procedura penală din Republica Moldova, Curtea de Apel poate reaudia toate probele care au fost prezentate în instanța de judecată în primă instanță, precum și probe noi. Mai mult, un inculpat penal poate prezenta noi probe disculpatorii pentru a fi examinate de instanță în orice etapă a procedurii sau chiar și după ce procedura s-a încheiat.

10. În consecință, în numele dlui Șor, eu și co-avocatul meu am solicitat mărturia dlui Dohotaru pentru a fi utilizată în cadrul procedurii în fața Curții de Apel. În mod specific, la 7 iulie 2021 sau în jurul acestei date, am depus o cerere prin care am solicitat să fie dispusă audierea martorului acuzării Matei Dohotaru și să fie citat de către Curte să se prezinte la ședința de judecată la Curtea de Apel Cahul.

11. La sau în jurul datei de 20 august 2021, Curtea Supremă de Justiție a Republicii Moldova a strămutat recursul dlui Șor de la Curtea de Apel Cahul la Curtea de Apel Chișinău. În conformitate cu legislația moldovenească, Curtea de Apel Chișinău a fost obligată să reia reexaminarea probelor. La Curtea de Apel Chișinău, acuzarea l-a solicitat pe dl Dohotaru în calitate de martor nr. 1 pe lista de martori, ceea ce a fost aprobat de instanță. Ulterior, acuzarea a declarat Curții că dl Dohotaru nu este disponibil pentru a depune mărturie în direct, deoarece locuiește în afara Republicii Moldova, în Statele Unite ale Americii.

12. Domnul Dohotaru este martor, nu parte în procedura pentru care se solicită mărturia sa. Declarațiile sale stau la baza faptelor pretinse utilizate de acuzare în acuzarea dlui Șor. La Curtea de Apel Cahul, înainte ca recursul să fie transferat la Chișinău, Curtea a permis citirea declarațiilor de martor ale dlui Dohotaru din procesul de primă instanță. După informarea că dl Dohotaru se află în Moldova, Judecătoria Cahul a acceptat și cererea noastră de prezentare în instanță a dlui Dohotaru. La Curtea de Apel Chișinău, instanța a acceptat lista de martori ai acuzării, inclusiv pe dl Dohotaru în calitate de prim martor al acuzării. Poziția procuraturii a rămas aceea că nu l-au putut prezenta pe

3

**MOTION EXHIBIT 1_PAGE_056**

dl Dohotaru pentru a depune mărturie în direct, deoarece acesta locuiește în străinătate, în Statele Unite ale Americii.

13. Deoarece se pare că dl Dohotaru locuiește și lucrează în Statele Unite ale Americii, nu am avut posibilitatea de a efectua examinarea sa la Curtea de Apel Chișinău. În opinia mea, în calitate de avocat principal al apărării dlui Șor, luarea mărturiei dlui Dohotaru pentru a fi utilizată în cadrul procedurilor penale a fost de o importanță critică, având în vedere rolul central pe care dl Dohotaru l-a jucat în procesul în fața instanței de fond și noile probe pe care le-am obținut între timp, care contrazic declarațiile și mărturiile dlui Dohotaru.

14. Mai mult, consider că dl Dohotaru are probabil documente potențial relevante în posesia sa. Astfel de documente sunt susceptibile de a include comunicări cu procuratura din Moldova cu privire la mărturia sa, acorduri de cooperare sau alte documente care să ateste orice acord, concesie, contraprestație sau beneficiu care i-a fost oferit în schimbul cooperării sale pentru a depune mărturie împotriva dlui Șor, precum și documente privind presupusele tranzacții bancare frauduloase care au avut loc în timp ce dl Dohotaru deținea o funcție oficială la Banca Națională a Moldovei.

15. În afară de mine și de colegii mei moldoveni, dl Șor a fost reprezentat recent (din decembrie 2022) în cadrul procedurilor penale din Moldova și de avocați din Regatul Unit, Shaul Brazil și John Binns, parteneri la firma BCL Solicitors LLP din Londra, Marea Britanie, care au fost admiși în Registrul avocaților străini din Republica Moldova în decembrie 2022. În cadrul unei audieri în Republica Moldova la 10 martie 2023, avocații din Regatul Unit au depus o cerere de acordare de timp suplimentar în scopul întocmirii Petiției și al obținerii mărturiei dlui Dohotaru. Cererea a fost respinsă de Curtea de Apel Chișinău.

16. După cum s-a indicat mai sus, procedura de recurs în fața Curții de Apel Chișinău a început în august 2021. La ședința din 10 martie 2023, după 17 luni de proces, Curtea de Apel a declarat că ancheta judiciară (etapa probatorie a procedurii) a fost finalizată și a dispus ca pledoariile finale să fie prezentate la 12 aprilie 2023.

4

17. În urma încheierii pledoariilor finale la 13 aprilie 2023, în aceeași zi, Curtea de Apel s-a retras imediat pentru a examina decizia sa și - în câteva ore - a emis o hotărâre definitivă, respingând recursul dlui Șor ca nefondat (și/sau emis peste termen) și admițând recursul procurorului, declarându-l astfel pe dl Șor vinovat de înșelăciune în conformitate cu art. 190 alin. (5) din Codul penal al Republicii Moldova și de spălare de bani conform art. 243 alin. (3) din Codul penal al Republicii Moldova. Curtea l-a condamnat pe dl Șor la 15 ani de închisoare.

18. Pronunțarea deciziei motivate (hotărârea scrisă a Curții) prin care s-a confirmat condamnarea dlui Șor a avut loc la 30 mai 2023. Decizia motivată are un volum de aproximativ 200 de pagini, iar o traducere profesionistă în limba engleză nu a fost încă obținută. Cu toate acestea, confirm că instanța a continuat să se bazeze pe mărturia dlui Dohotaru din procesul în primă instanță ca probă principală împotriva dlui Șor.

19. Sau, făcând abstracție de toate argumentele apărării privind lipsa veridicității declarațiilor dlui Dohotaru și a solicitărilor de audiere a acestuia în instanța de apel (în oricare din modalitățile prevăzute de Codul de procedură penală), mai ales, în contextul probelor noi administrate, Curtea de Apel Chișinău a agravat situația dlui Șor, fiind pronunțată o soluție mult mai gravă față de cea dată de prima instanță, fără ca să audieze martorul respectiv, dar, bazându-se pe cele declarate de acesta anterior, care de altfel nici măcar nu au fost date citirii în modul prevăzut.În pofida faptului că procedura de apel s-a încheiat acum și în lumina circumstanțelor prezentate în prezenta declarație, consider că luarea mărturiei dlui Dohotaru rămâne de o importanță esențială și deosebit de actuală.

### *Casație (recurs) ordinară*

20. În primul rând, la data de 30 iunie 2023 sau înainte de această dată (adică în termenul legal de 30 de zile de la data pronunțării deciziei motivate), eu și colegul meu avocat vom iniția un recurs în casație la Curtea Supremă de Justiție a Republicii Moldova, care constituie instanța internă de ultimă instanță.

21. În conformitate cu articolul 435 din Codul de procedură penală al Republicii Moldova, Curtea Supremă de Justiție este competentă să emită una dintre următoarele decizii:

    (i)  respingerea recursului ca inadmisibil și menținerea hotărârii atacate, sau

5

(ii) admiterea recursului și revocarea, în întregime sau în parte, a hotărârii atacate prin:

- menținerea hotărârii instanței de fond în cazul în care se consideră că recursul a fost admis în mod eronat,
- achitarea inculpatului sau încetarea procedurii penale împotriva acestuia,
- rejudecarea cauzei și pronunțarea unei noi hotărâri sau dispunerea rejudecării cauzei de către Curtea de Apel în cazul în care eroarea judiciară nu poate fi remediată de către Curtea Supremă de Justiție.

22. În principiu, Curtea Supremă de Justiție se pronunță în primul rând asupra chestiunilor de drept și nu este, în general, o instanță de fapt. Cu toate acestea, în această etapă pot fi totuși introduse probe noi dacă acestea nu erau cunoscute de inculpat sau dacă inculpatul nu a avut acces la aceste probe înainte ca instanța de apel să emită verdictul său.

23. În circumstanțele prezentei cauze, luarea mărturiei dlui Dohotaru este în mod necesar condiționată de acceptarea Petiției. Ca atare, dl Șor nu a avut acces la această probă în timpul procedurii în fața Curții de Apel și va avea dreptul de a o prezenta, odată obținută, în fața Curții Supreme de Justiție.

24. În acest context, sunt de părere că mărturiile și documentele obținute de la dl Dohotaru pot fi încă introduse și evaluate în cadrul procedurilor penale împotriva dlui Șor, fie în fața Curții Supreme de Justiție, fie în fața Curții de Apel (în cazul în care Curtea Supremă de Justiție va dispune rejudecarea cauzei de către Curtea de Apel).

### *Căi extraordinare de atac*

25. În plus față de cele de mai sus, Codul de procedură penală al Republicii Moldova prevede așa-numitele căi de atac extraordinare - "recursul în anulare" și "revizuirea procedurilor penale", care pot fi introduse în ceea ce privește hotărârile irevocabile (adică atunci când toate căile de atac ordinare au fost epuizate). O cale extraordinară de atac în favoarea inculpatului poate fi inițiată în orice moment.

26. În conformitate cu articolul 458 din Codul de procedură penală al Republicii Moldova, se poate solicita o "revizuire a procedurilor penale" în cazul în care fapte noi, necunoscute la momentul pronunțării hotărârii definitive și irevocabile, dovedesc

6

nevinovăția inculpatului sau că acesta a comis o infracțiune mai puțin gravă decât cea pentru care a fost condamnat.

27. În conformitate cu articolele 462 și 463 din Codul de procedură penală al Republicii Moldova, o "revizuire a procedurilor penale" este o audiere *de novo* a cauzei în conformitate cu normele de procedură aplicabile proceselor în primă instanță, inclusiv reexaminarea probelor admise anterior și evaluarea probelor noi prezentate de către părți.

### *Concluzie*

28. În calitate de avocat al dlui Șor în cadrul procedurilor penale din Republica Moldova, pot să afirm că dl Șor nu încearcă să eludeze nicio restricție aplicabilă privind colectarea probelor. După cunoștințele mele, nu există nicio normă care să-i interzică dlui Șor să depună Petiția în Statele Unite ale Americii.

Declar, sub sancțiunea de sperjur în conformitate cu legile Statelor Unite ale Americii, că cele de mai sus sunt adevărate și corecte. Semnat la data de [...] la Chișinău, Republica Moldova.

/s/
Aureliu Colenco

7

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

IN RE APPLICATION OF ILAN SHOR
FOR AN ORDER DIRECTING
DISCOVERY FROM MATEI DOHOTARU
PURSUANT TO 28 U.S.C. § 1782

Case No. 1:22-mc-0027-MSN-WEF

### DECLARATION OF AMELIA J. SCHMIDT IN SUPPORT OF
### ILAN SHOR'S RENEWED PETITION FOR DISCOVERY
### IN AID OF A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. § 1782

I, Amelia J. Schmidt, hereby declare, under penalty of perjury pursuant to 28 U.S.C.

§ 1746(2), that the following is true and correct to the best of his knowledge, information, and

belief:

1.     I am a counsel with the law firm KaiserDillon PLLC and represent Ilan Shor in

the above-captioned action. I submit this Declaration to provide certain information relevant to

Mr. Shor's Renewed Petition for Discovery in Aid of a Foreign Proceeding Pursuant to 28

U.S.C. § 1782.

2.     Upon information and belief, based on open-source information, Mr. Matei

Dohotaru currently resides in Arlington, Virginia.

3.     Upon information and belief, based on open-source information, Mr. Dohotaru is

currently employed by the World Bank.

I declare under penalty of perjury that the foregoing is true and correct to be best of my

knowledge, information, and belief.

Dated: June 8, 2023
Washington, D.C.

_____
Amelia J. Schmidt

**MOTION EXHIBIT 1_PAGE_061**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| **IN RE APPLICATION OF ILAN SHOR FOR AN ORDER DIRECTING DISCOVERY FROM MATEI DOHOTARU PURSUANT TO 28 U.S.C. § 1782** | Case No. 1:23-mc-0012 |

## MEMORANDUM IN SUPPORT OF ILAN SHOR'S PETITION FOR DISCOVERY IN AID OF A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. § 1782

Christopher Muha
  Virginia Bar No. 89751
Matthew G. Kaiser*
  D.C. Bar No. 486272
Amelia J. Schmidt*
  D.C. Bar No. 1012380
KAISERDILLON PLLC
1099 14th Street NW
8th Floor West
Washington, DC  20005
Telephone: 1 (202) 640-2850
Facsimile: 1 (202) 280-1034
*Pro hac vice petition to be filed

*Counsel for Petitioner Ilan Shor*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 2

    I.    ABOUT ILAN SHOR ..................................................................................... 2

    II.   THE CRIMINAL CASE AGAINST MR. SHOR IN MOLDOVA ...................... 2

        A.    Mr. Shor's First Trial ............................................................... 2

        B.    Matei Dohotaru ......................................................................... 3

        C.    Mr. Shor's Appeal .................................................................... 5

        D.    Ongoing Proceedings In Moldova .......................................... 7

ARGUMENT ................................................................................................................. 9

    I.    THE PETITION SATISFIES THE STATUTORY REQUIREMENTS FOR
        DISCOVERY ................................................................................................. 10

    II.   THE DISCRETIONARY FACTORS IN *INTEL* FACTORS STRONGLY
        FAVOR GRANTING THE PETITION .......................................................... 11

        1.Whether The Person From Whom Discovery Is Sought Is A Party In The
        Foreign Proceeding ............................................................................. 12

        2. "[T]He Nature Of The Foreign Tribunal, The Character Of The Proceedings
        Underway Abroad, And The Receptivity Of The Foreign Government Or The
        Court Or Agency Abroad To U.S. Federal-Court Judicial Assistance" .............. 12

        3. Whether The Request "Conceals An Attempt To Circumvent" Foreign
        Restrictions Or United States Policies .................................................. 13

        4. Whether The Discovery Requested Is "Unduly Intrusive Or Burdensome"  ... 14

CONCLUSION .............................................................................................................. 15

# TABLE OF AUTHORITIES

Page

**Cases**

*Akimoto v. Apple Inc.*,
Case No. 22-mc-80056-DMR, 2022 WL 1157496 (N.D. Cal. Apr. 19, 2022) ...................... 10

*In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*,
121 F.3d 77 (2d Cir. 1997) ............................................................................................ 13

*In re Application of Chevron Corp.*,
762 F. Supp. 2d 242 (D. Mass. 2010) ............................................................................ 10

*In re Chevron Corp.*,
633 F.3d 153 (3d Cir. 2011) .......................................................................................... 13

*In re Chevron Corp.*,
No. 7:10-MC-00067, 2010 WL 4883111 (W.D. Va. Nov. 24, 2010) .............................. 14, 15

*In re Hansainvest Hanseatische Inv.-GmbH*,
364 F. Supp. 3d 243 (S.D.N.Y. 2018) ............................................................................ 15

*In re Nat'l Syndicate for Elec. Energy*,
No. 1:13-mc-20 (GBL/TCB), 2014 WL 130973 (E.D. Va. Jan. 14, 2014) ........................... 11

*In re Newbrook Shipping Corp.*,
31 F.4th 889 (4th Cir. 2022) ........................................................................................... 9

*In re Request for Jud. Assistance from Dist. Court in Svitavy, Czech Republic*,
748 F. Supp. 2d 522 (E.D. Va. 2010) ............................................................................. 10

*In re Rivada Networks*,
230 F. Supp. 3d 467 (E.D. Va. 2017) ............................................................................... 9

*In re Tiberius Grp. AG*,
19-mc-467 (VSB), 2020 WL 1140784 (S.D.N.Y. Mar. 6, 2020) ........................................ 14

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004) ........................................................................................................ 1

*ZF Auto. US, Inc. v. Luxshare, Ltd.*,
142 S.Ct. 2078 (2022) ................................................................................................... 11

**Statutes**

28 U.S.C. § 1782 ............................................................................................................. 8,9

**Foreign Statutes**

Criminal Procedure Code (2003) (Mold.), *available at*
https://www.legis.md/cautare/getResults?doc_id=129481&lang=ro ........................................ 8

ii

**MOTION EXHIBIT 1_PAGE_064**

**Other Authorities**

Eugen Muravschi, "The story of Moldova's lost billion so far: Kroll report leaked, businessman
    arrested, ex-President involved," Moldova.org (May 7, 2015),
    https://www.moldova.org/en/the-story-of-moldovas-lost-billion-so-far-kroll-report-leaked-
    businessman-arrested-ex-president-involved/ ................................................................. 3, 4, 5

## **INTRODUCTION**

In 2017, Ilan Shor was tried and convicted of various offenses connected to the disappearance of $1 billion from three Moldovan banks in 2014. Mr. Shor appealed those convictions—which, under Moldovan law, means he had the right to a *de novo* retrial of his case. But by the time of the retrial, one of the key cooperating witnesses at Mr. Shor's first trial— Matei Dohotaru—had left Moldova for the United States and currently resides in this District. The Moldovan Court of Appeal nevertheless allowed Mr. Dohatoru's prior testimony to be read into the record, and Mr. Shor was unable to cross-examine him at the retrial. Mr. Shor now seeks deposition testimony and documents from Mr. Dohotaru in the United States to present to the Moldovan courts and receive the fair retrial he's entitled to under Moldovan law and the European Convention on Human Rights.[1]

This is precisely the type of situation for which 28 U.S.C. § 1782 exists. Where, as here, a person resides in the United States—and his testimony and/or documents are needed for use in a proceeding in a foreign tribunal—U.S. courts have routinely ordered discovery in aid of the foreign proceedings. And the factors stated by the U.S. Supreme Court to guide the Court's discretion in ordering discovery under Section 1782 overwhelmingly support the Petition. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004).

Because Section 1782 gives Mr. Shor the right to access this critical evidence—and because the Court should give him that access under the factors the U.S. Supreme Court outlined

---

[1] Mr. Shor previously submitted an application for the same relief on October 25, 2022. *Shor v. Dohotaru*, 22-mc-27, ECF No. 1. Mr. Shor's counsel subsequently withdrew, and delay in obtaining new counsel required him to withdraw the prior application with leave to refile. *Shor*, 22-mc-27, ECF No. 16 (Mar. 21, 2023).

in *Intel*—the Court should grant Mr. Shor's petition and order the deposition and document discovery he seeks from Mr. Dohotaru.

## BACKGROUND

### I.     About Ilan Shor

Mr. Shor is a prominent businessman and politician in Moldova. He is the leader of the Şor Party, a minority, opposition political party in Moldova. *See* Declaration of Aureliu Colenco ("Colenco Decl.") ¶ 4. In 2014, Mr. Shor accepted an appointment as Chairman of the Board of one of Moldova's largest banks, Banca de Economii. Colenco Decl. ¶ 4. In March 2019, Mr. Shor became a member of the Parliament of the Republic of Moldova, a position he held until April 27, 2023, when the current parliamentary majority voted to strip him of his mandate, namely in connection with his conviction on 04.13.2023 by the Chisinau Court of Appeal (as described further below). Colenco Decl. ¶ 4.

### II.     The Criminal Case Against Mr. Shor in Moldova

Several months after Mr. Shor's appointment to serve as the Chairman of Banca de Economii, the National Bank of Moldova ("NBM"), which exercises regulatory authority over Moldova's banking system, placed Banca de Economii and two other major Moldovan banks—Unibank, S.A. and Banca Sociala, S.A. (collectively, the "Moldovan Banks")—under temporary administration due to insufficient liquidity. Declaration of Shaul Brazil ("Brazil Decl.") ¶ 5. In 2016, the Moldovan Anti-Corruption Prosecutor's Office charged Mr. Shor with criminal fraud and money laundering in connection with the collapse of the Moldovan Banks. *See* Colenco Decl. ¶ 5.

#### A.     Mr. Shor's First Trial

In June 2017, the Moldovan court of first instance—the Chisinau Court, Buiucani Division ("the court of first instance")—acquitted Mr. Shor of fraud but found him guilty of the

2

lesser offense of causing material damage through deception or abuse of trust, as well as money laundering. *See* Colenco Decl. ¶ 5; *see also* Judgment dated June 21, 2017 of the Chisinau Court, Buiucani Division against Mr. Ilan Shor at 42 (excerpts, along with certified translations, are attached as Exhibit A to Brazil Decl.).

### B.    Matei Dohotaru

Matei Dohotaru—who once held a high-ranking supervisory position at NBM—was the Moldovan government's star witness at the trial before the court of first instance. Colenco Decl. ¶ 5. Mr. Dohotaru testified at the first trial, *inter alia*, that companies connected to Mr. Shor were involved in fictitious banking transactions to conceal bank fraud. Colenco Decl. ¶ 7. Evidence has since come to light that's cast serious doubt on that testimony that Mr. Shor was unable to use to cross-examine Mr. Dohotaru on retrial.

First, Mr. Dohotaru was almost certainly a cooperating witness motivated to save himself from prosecution in testifying against Mr. Shor at trial. While there's been no record disclosed to the defense of any agreement to cooperate, according to Moldovan press reports, he was arrested in 2015 in connection with misfeasance while acting in his duty as a supervisor at NBM. *See* Brazil Decl. ¶ 30; Eugen Muravschi, "The story of Moldova's lost billion so far: Kroll report leaked, businessman arrested, ex-President involved," Moldova.org (May 7, 2015), https://www.moldova.org/en/the-story-of-moldovas-lost-billion-so-far-kroll-report-leaked-businessman-arrested-ex-president-involved/. And Mr. Dohotaru was allowed by Moldovan authorities to leave Moldova shortly after giving testimony against Mr. Shor in June 2017. Brazil Decl. ¶ 30. Based on open-source information, it is counsel's understanding that Mr. Dohotaru was then able to secure employment at the World Bank. Declaration of Amelia J. Schmidt ("Schmidt Decl.") ¶ 3. Thus, there is every reason to believe that Mr. Dohotaru was a cooperator and had a clear motive to fabricate testimony that was unfavorable to Mr. Shor.

**MOTION EXHIBIT 1_PAGE_068**

Second, additional evidence casts further doubt on the reliability of Mr. Dohotaru's testimony. Mr. Shor's defense has obtained bank records that directly contradict some of that testimony. Brazil Decl. ¶ 30. And Mr. Dohotaru's testimony appears to have been based largely—perhaps entirely—on a single report prepared by the Kroll investigative firm ("the Kroll report") at NBM's request. The Kroll report was never admitted into evidence at trial, and for good reason—its own preparers admitted that it had had to rely solely on information that NBM provided and which it had not been able to independently verify.[2] Brazil Decl. ¶ 25. And it's been reported that Mr. Dohotaru himself was the source for many of the assertions in that report. Brazil Decl. ¶ 27; *See* Eugen Muravschi, "The story of Moldova's lost billion so far: Kroll report leaked, businessman arrested, ex-President involved," Moldova.org (May 7, 2015), https://www.moldova.org/en/the-story-of-moldovas-lost-billion-so-far-kroll-report-leaked-businessman-arrested-ex-president-involved/. In other words, Mr. Dohotaru's testimony was either based on hearsay from a third-party report that wasn't even part of the trial record and which its own preparers admitted was based on information they hadn't been able to verify independently—or the court of first instance heard Mr. Dohotaru's own biased assertions cloaked in the guise of a neutral third-party investigator's report.

Nevertheless, the court of first instance relied heavily on Mr. Dohotaru's testimony—and, by extension, the Kroll report—in convicting Mr. Shor. *See* Colenco Decl. ¶ 6 (the court of first instance "rested its guilty verdict largely on Mr. Dohotaru's testimony, which is contested

---

[2]    We understand that Kroll prepared two additional reports in 2017 and 2018—after Mr. Dohotaru gave his testimony at the first instance trial—one of which was apparently released to the public online and is now a matter of public record.  Notwithstanding the reference in the Judgment to "Kroll reports" in the plural, we are aware of only one Kroll report that existed at the time: the heavily caveated "preliminary scoping report," which does not appear to have been intended to serve any evidentiary purpose in a criminal proceeding. Brazil Decl. ¶ 23 n.1.

by Mr. Shor in numerous key respects.").  The court of first instance discussed Mr. Dohotaru's

testimony at length—including the fact that Mr. Dohotaru acknowledged that he relied heavily

on the so-called "Kroll reports," which were apparently not admitted into evidence in the

proceedings.[3]  *See* Judgment at 42 (Brazil Decl., Ex. A) ("*The witness indicated that from the*

*reports presented by the Kroll company, the involvement of Ilan Shor in the bank fraud is*

*confirmed.*") (emphasis in original).

### C.    Mr. Shor's Appeal

On July 31, 2017, Mr. Shor appealed his convictions. Colenco Decl. ¶ 7.[4] The Moldovan

government also appealed both the acquittal on the fraud count and Mr. Shor's sentence; the

Chisinau Court had sentenced Mr. Shor to seven years and six months in prison, and prosecutors

sought an increased sentence of nineteen years. Prosecutor's Petition for Appeal dated July 28,

2017 at 165, 167 (excerpts, along with certified translations, are attached as Exhibit B to Brazil

Decl.). Colenco Decl. ¶ 7.

Mr. Shor's appellate counsel raised numerous grounds on appeal, chiefly among them

challenges to Mr. Dohotaru's testimony, including:

- Additional bank records that contradicted Mr. Dohotaru's statements at trial;

- Mr. Dohotaru's incentives to testify against Mr. Shor;

---

[3]    As discussed below, the Kroll report was apparently leaked to the press by the then-Speaker
of the Moldovan Parliament.  *See* Eugen Muravschi, "The story of Moldova's lost billion so far:
Kroll report leaked, businessman arrested, ex-President involved," Moldova.org (May 7, 2015),
https://www.moldova.org/en/the-story-of-moldovas-lost-billion-so-far-kroll-report-leaked-
businessman-arrested-ex-president-involved/.

[4]    Although the prosecution and defense originally brought their respective appeals in different
courts of appeal, Mr. Shor's appeal was transferred to the same appellate court in which the
prosecution had commenced its appeal (the Chisinau Court of Appeal). Colenco Decl. ¶ 7.

- Mr. Dohotaru's reliance on the Kroll report, which should not have been relied on, and should not have been relied on by Mr. Dohotaru, who was reportedly the *source* for many of the assertions in Kroll's "preliminary scoping report."

Colenco Decl. ¶¶ 13-14; Brazil Decl. ¶ 29-30.

As explained by Aureliu Colenco—Mr. Shor's lead criminal defense counsel in the appellate proceedings—appeals in Moldovan criminal cases entail full evidentiary proceedings, meaning the Court of Appeal reconsiders the entire evidentiary record *de novo*, as well as any new exculpatory evidence presented by the defense. Indeed, under Moldovan law, a criminal defendant can present new exculpatory evidence at any time—even after the proceedings have concluded. Colenco Decl. ¶ 7. Accordingly, Mr. Shor's appellate counsel sought to compel Mr. Dohotaru to testify and produce documents in his possession for use in Mr. Shor's defense on appeal. Colenco Decl. ¶ 8. The prosecution, too, "requested Mr. Dohotaru as witness # 1 on their witness list, which the Court approved." *Id*. ¶ 9.

However, the prosecution later advised the Court of Appeal that Mr. Dohotaru was unavailable to be examined, because he now resides in the United States, and could not be compelled to travel to Moldova to give testimony. Colenco Decl. ¶¶ 12-13; Brazil Decl. ¶¶ 9, 28. As a result, the Chisinau Court of Appeal ordered the summary of Mr. Dohotaru's testimony from the first trial to be read into the record of its evidentiary proceedings, thereby depriving Mr. Shor's defense counsel of the ability to question Mr. Dohotaru on cross-examination—which he had a right to do under Moldovan law, particularly in light of the additional evidence that had surfaced. Colenco Decl. ¶ 12; Brazil Decl. ¶ 28.

On April 13, 2023—within hours after the end of two full days of closing arguments—the Chisinau Court of Appeal announced that not only did it affirm Mr. Shor's convictions, it (1)

6

convicted him of the additional fraud charge that the court of first instance had acquitted him of, and (2) sentenced him to fifteen (15) years in prison. Colenco Decl. ¶ 17; Brazil Decl. ¶ 15.

      The Court issued a 200-page opinion in support of this decision on May 30, 2023, of which Mr. Shor's counsel in the United Kingdom is working diligently to obtain a full English translation. *See* Brazil Decl. ¶ 15. Nevertheless, Mr. Shor's Moldovan counsel has reviewed the decision in Romanian and confirmed that the Court of Appeal "continued to rely on Mr. Dohotaru's testimony from the first instance trial as the primary evidence against Mr. Shor." Colenco Decl. ¶ 18.

### D.     Ongoing Proceedings in Moldova

      The criminal case is far from over, and as Mr. Shor's criminal counsel in Moldova has attested, "the taking of Mr. Dohotaru's testimony remains of key importance." Colenco Decl. ¶ 19; *see also* Brazil Decl. ¶ 16 ("Mr. Dohotaru's testimony remains of critical importance to Mr. Shor's defense and can still be used in the pending criminal proceedings against him.").

      First, Mr. Shor's defense has the right to—and intends to—appeal to the Supreme Court of Justice of the Republic of Moldova, which constitutes the domestic court of last instance, on or before June 30, 2023. Colenco Decl. ¶ 20; Brazil Decl. ¶ ¶ 17-18. While the Moldovan Supreme Court

> rules primarily on matters of law and is not generally a court of fact . . . fresh evidence may still be introduced at this stage if that evidence was not known to the defendant, or the defendant did not have access to the evidence before the Court of Appeal issued its verdict.

Colenco Decl. ¶ 22. According to Mr. Shor's Moldovan counsel, because he did not have access to live testimony or documents from Mr. Dohotaru during the proceedings before the Court of Appeal, he'll be entitled to introduce it, once obtained, before the Moldovan Supreme Court, at

which point the Moldovan Supreme Court may either hear it directly and vacate the conviction based on that, or remand to the Court of Appeal for rehearing. Colenco Decl. ¶¶ 21-23.

Second, even if the Moldovan Supreme Court does not consider the evidence, Mr. Shor has the opportunity to pursue an extraordinary appeal—referred to as a "cassation for annulment" and "review of criminal proceedings"—under Article 458 of the Moldovan Code of Criminal Procedure, which allows a defendant to request a *de novo* review of criminal proceedings where, *inter alia*, new exculpatory evidence has been obtained. Colenco Decl. ¶¶ 25-27 (citing Articles 462 and 463 of the Moldovan Code of Criminal Procedure).

Finally, Mr. Shor's counsel in the United Kingdom has stated that if the Moldovan courts grant Mr. Shor no relief, the defense intends to appeal to the European Court of Human Rights ("ECtHR") on the grounds that the Moldovan criminal proceedings violated Mr. Shor's fundamental rights under the European Convention on Human Rights. Brazil Decl. ¶ 19. Any challenge before the ECtHR would include raising "the improper reliance on Mr. Dohotaru's evidence in the Court of Appeal in circumstances where Mr. Shor was deprived of the opportunity to cross-examine him." Brazil Decl. ¶ 20. And "[i]f the evidence obtained from Mr. Dohotaru pursuant to the Petition undermines the prosecution case or supports the defence case—as we anticipate it will—and the Moldovan Supreme Court declines improperly to admit it or take it into account, we will adduce this further violation before the ECtHR." Brazil Decl. ¶ 20.

# **ARGUMENT**[5]

Under 28 U.S.C. § 1782, a federal district court can order discovery from persons who reside or are found within its district for use "to give . . . testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a).[6]

Even if the statutory requirements are satisfied, the U.S. Supreme Court has outlined four discretionary factors that courts must consider prior to granting a Section 1782 petition:

(1) Whether the person from whom discovery is sought is a party in the foreign proceeding;

(2) "[T]he nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance";

(3) Whether the request "conceals an attempt to circumvent" foreign restrictions or United States policies; and

(4) Whether the discovery requested is "unduly intrusive or burdensome." *Intel Corp.*, 542 U.S. at 244-45, 264-65.

---

[5]   We set forth the bases for this Court's jurisdiction and venue in this matter in the accompanying Petition.

[6]   As stated in the accompanying Petition, courts regularly grant petitions for discovery under 28 U.S.C. § 1782 on an *ex parte* basis. *In re Newbrook Shipping Corp.*, 31 F.4th 889, 892 (4th Cir. 2022) ("Under § 1782, a party in a foreign proceeding can obtain a discovery order for materials from an American target for use in the foreign proceeding. These applications are often decided ex parte, with the target having a chance to later challenge the discovery order."); *In re Rivada Networks*, 230 F. Supp. 3d 467, 473 (E.D. Va. 2017) ("Of course, Rivada's decision to file an ex parte § 1782 application was proper—indeed, that decision was unremarkable, as § 1782 applications are routinely filed ex parte.").

For the reasons set forth below, the Petition satisfies all of these requirements, and Mr. Shor respectfully requests that the Court issue a subpoena for Mr. Dohotaru to provide testimony and documents in connection with Mr. Shor's criminal case in Moldova.

## I.     The Petition Satisfies the Statutory Requirements for Discovery

Mr. Shor's Petition plainly satisfies Section 1782's requirements that any request for discovery (1) seek discovery from a person located in the district where it is being filed; (2) be brought by an international tribunal or any "interested person"; and (3) be for use in a proceeding before a foreign tribunal. 28 U.S.C. § 1782.

First, Mr. Dohotaru currently resides in Arlington, Virginia, which is located within the Eastern District of Virginia. *See* Schmidt Decl. ¶ 2. Therefore, he "resides or is found" within this District. *In re Request for Jud. Assistance from Dist. Court in Svitavy, Czech Republic*, 748 F. Supp. 2d 522, 525 (E.D. Va. 2010).

Second, Mr. Shor is seeking the discovery for a criminal case in which he's a defendant, appellant, and cross-appellant; he could hardly be a more interested person under 28 U.S.C. § 1782. *See Intel Corp.*, 542 U.S. at 256 ("No doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782[.]"). Defendants in foreign criminal proceedings fall squarely within the category of an "interested person" under Section 1782. *See, e.g.*, *Akimoto v. Apple Inc.*, Case No. 22-mc-80056-DMR, 2022 WL 1157496, at *2 (N.D. Cal. Apr. 19, 2022) ("Akimoto qualifies as an 'interested' party, since he is the defendant in the criminal proceeding and is pursuing the appeal of his conviction."); *In re Application of Chevron Corp.*, 762 F. Supp. 2d 242, 249 (D. Mass. 2010) ("[A]s civil and criminal defendants in the Ecuadorian proceedings, the applicants are 'interested persons' within the meaning of Section 1782.") Indeed, considering the seriousness of the charges against Mr. Shor and the fifteen-year sentence imposed, there could hardly be a more compelling interest in

**MOTION EXHIBIT 1_PAGE_075**

the outcome of a foreign proceeding. Should Mr. Shor be unable to cross-examine Mr. Dohotaru, he will be effectively unable to vindicate his rights under Moldovan law.

Third, Mr. Shor seeks to use the discovery in a proceeding before a "foreign or international tribunal," which the Moldovan Supreme Court plainly is. The Moldovan Supreme Court is empowered to hear fresh evidence that was not available at the time of the proceedings before the Court of Appeal; he may submit new exculpatory evidence for consideration by the Court at any stage of the proceedings, or even after the proceedings have concluded. Colenco Decl. ¶¶ 7, 9. The U.S. Supreme Court—and this Court—have made clear this is more than sufficient to qualify as a foreign tribunal. *See ZF Auto. US, Inc. v. Luxshare, Ltd.*, 142 S. Ct. 2078, 2087 (2022) (a "foreign tribunal" is "a tribunal belonging to a foreign nation," meaning that it "possess[es] sovereign authority conferred by that nation."); *see also In re Nat'l Syndicate for Elec. Energy*, No. 1:13-mc-20 (GBL/TCB), 2014 WL 130973, at *3 (E.D. Va. Jan. 14, 2014) (citing *Intel Corp.*, 542 U.S. at 256, 258-59) (a "foreign tribunal" for Section 1782 purposes is "a 'proof-taking' body with the 'authority to determine liability and impose penalties' and the power to issue 'a dispositive ruling, *i.e.*, a final administrative action both responsive to the complaint and reviewable in court.'").

Because (1) Mr. Dohotaru resides in Arlington, Virginia; (2) Mr. Shor is a party to the proceedings before the Moldovan Supreme Court; and (3) the Moldovan Supreme Court is a "foreign tribunal," the Petition satisfies all three statutory requirements.

II.  **The Discretionary Factors in *Intel* Factors Strongly Favor Granting the Petition**

Since Mr. Shor satisfies the statutory requirements for discovery pursuant to 28 U.S.C. § 1782, this Court has discretion to grant the Petition and should grant it under the factors stated by the U.S. Supreme Court in *Intel Corp*.

### 1. Whether the person from whom discovery is sought is a party in the foreign proceeding

Mr. Dohotaru is not a party to the Moldovan proceedings, which weighs in favor of granting the petition. As the U.S. Supreme Court has explained, Section 1782 discovery is ordinarily necessary when "evidence is sought from a nonparticipant in the matter arising abroad," because "nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unattainable absent § 1782(a) aid." *Intel Corp.*, 542 U.S. at 264; *In re Request for Jud. Assistance*, 748 F. Supp. 2d at 526 ("[I]f Fitzkee were a 'nonparticipant,' this would typically weigh *in favor* of granting the requested discovery.") (emphasis in original).

This is precisely such a case. Mr. Dohotaru is not a party to the Moldovan proceedings, but a witness—and a critical one. Given that Mr. Dohotaru is a non-party to the Moldovan proceedings, and that he now resides in the United States, his testimony—and relevant documents in his possession—are unattainable absent this Court's assistance under Section 1782. Only by obtaining documentary and testimonial evidence from Mr. Dohotaru can Mr. Shor hope effectively to dispute the evidence relied upon by the prosecution. At the very least, he must be allowed to confront the key witness against him and to test Mr. Dohotaru's account, which he has a right to do either at the Moldovan Supreme Court or (if the Supreme Court remands) the Court of Appeal. The first *Intel* factor weighs heavily in favor of granting the Petition.

### 2. "[T]he nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"

The nature of the foreign tribunal—currently, the Moldovan Supreme Court—the fact that criminal proceedings are underway abroad, and the documented receptivity of the Moldovan

courts' receptivity to Mr. Dohotaru's testimony in this matter, weigh in favor of granting the Petition.

As discussed above, Moldovan law guarantees Mr. Shor the right to present evidence, including new evidence, in support of his case, even at the Moldovan Supreme Court. *See* Colenco Decl. ¶¶ 21-23. Receiving new evidence, such as the evidence sought by the Petition, is in keeping with the Moldovan Supreme Court's mandate. There is no reason to believe that the Moldovan Supreme Court would be unreceptive to the requested evidence; indeed, there is every reason to believe that it will be receptive.[7] *See Intel Corp.*, 542 U.S. at 264. The court of first instance accepted Mr. Dohotaru's testimony, and the Court of Appeal also accepted the prosecution's proffer of Mr. Dohotaru as a witness. Had Mr. Dohotaru been in Moldova, there is every reason to believe he could have been compelled to appear in the Court of Appeal. *See* Colenco Dec. ¶¶ 9-13. For all of these reasons, the second *Intel* factor weighs in favor of granting the Petition.

### 3. Whether the request "conceals an attempt to circumvent" foreign restrictions or United States policies

Mr. Shor is not attempting to circumvent any proof-gathering restrictions in the Moldovan proceedings. There are no applicable evidentiary rules that prohibit Mr. Shor from

---

[7] And to the extent Mr. Dohotaru seeks to oppose the subpoena requested once it issues, he will bear the burden of proving that the Moldovan Supreme Court would be unreceptive. *In re Chevron Corp.*, 633 F.3d 153, 162 (3d Cir. 2011) ("[T]he parties opposing discovery under section 1782 . . . bear the 'burden of demonstrating offense to the foreign jurisdiction.'"). To satisfy this burden will require "authoritative proof" that the foreign tribunal would reject evidence obtained pursuant to Section 1782. *In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 80 (2d Cir. 1997) ("[A]bsent 'authoritative proof that a foreign tribunal would reject the evidence obtained with the aid of section 1782,' . . . a district court should not refrain from granting the assistance afforded under the Act based simply on allegations to that effect.") (quoting *In re Application of Euromepa, S.A.*, 51 F.3d 1095, 1100 (2d Cir. 1995)).

availing himself of this Court's assistance under Section 1782. Colenco Decl. ¶ 13. He is simply seeking this discovery in a good-faith effort to obtain evidence critical to the Moldovan proceedings that is otherwise unavailable to him. *See In re Ulmans*, No. MC-22-00052-PHX-GMS, 2023 WL 1767194, at *2 (D. Ariz. Feb. 3, 2023) (finding third *Intel* factor met where defendant in criminal proceedings in Latvia sought "exculpatory evidence from third parties"); *In re Chevron Corp.*, No. 7:10-MC-00067, 2010 WL 4883111, at *3 (W.D. Va. Nov. 24, 2010) (finding the third *Intel* factor met where discovery was sought in good faith and the respondent was not subject to the tribunal's jurisdiction); *see also In re Tiberius Grp. AG*, 19-mc-467 (VSB), 2020 WL 1140784, at *4 (S.D.N.Y. Mar. 6, 2020) ("Only where the materials being sought are privileged or otherwise prohibited from being discovered or used is the third *Intel* factor implicated."). Under basic notions of fairness and due process that exist in both the U.S. and Moldovan legal systems—and under the European Convention on Human Rights, which will apply if Mr. Shor exhausts his appeals in Moldova and seeks relief before ECtHR—Mr. Shor is entitled to marshal evidence in defense of the criminal charges pending against him. *See* Colenco Decl. ¶¶ 21-23, Brazil Decl. ¶¶ 19-20. Without this Court's assistance under Section 1782, Mr. Shor—and the Moldovan Supreme Court—will be deprived of the opportunity to hear all of the relevant evidence as guaranteed under Moldovan law. The third *Intel* factor therefore weighs in favor of granting the Petition.

### 4. *Whether the discovery requested is "unduly intrusive or burdensome"*

Mr. Shor's requested discovery is not a burdensome "fishing expedition." Mr. Dohotaru was the key prosecution witness in the first-instance trial, and before the Court of Appeal (albeit his evidence there was not subject to cross-examination). He has information related to NBM's actions and inaction in relation to the transactions involving the Moldovan Banks, his reliance on

the Kroll reports, as well as his own interactions with Moldovan prosecutors. These issues are of critical importance to the Moldovan proceedings as they bear on the merits of the serious charges against Mr. Shor, as well as the reliability of Mr. Dohotaru's evidence. *See* Colenco Decl. ¶ 11. Because Mr. Shor seeks discovery tailored to obtain information regarding these relevant issues, the fourth *Intel* factor weighs in favor of granting the Petition. *See In re Hansainvest Hanseatische Inv.-GmbH*, 364 F. Supp. 3d 243, 252 (S.D.N.Y. 2018) (granting requests characterized by petitioners as "narrowly tailored" subject to certain conditions to ease potential burdens to foreign custodians); *In re Chevron Corp.*, 2010 WL 4883111, at *3 (finding Section 1782 petition's request reasonable where it concerned issues relevant to the foreign proceeding).

Again, this is a paradigmatic case for the application of Section 1782 in aid of a foreign proceeding. Where, as here, an individual faces serious criminal charges in a foreign court, the key witness is unavailable to the foreign court but is present in the United States, and all statutory and discretionary factors are satisfied, there could hardly be a more compelling case to grant discovery under Section 1782.

## **CONCLUSION**

For the foregoing reasons, Petitioner respectfully requests that the Court grant his Petition for Discovery in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782, and authorize the issuance of the Rule 45 subpoenas seeking Mr. Dohotaru's deposition testimony and production of documents, which are submitted herewith.

**MOTION EXHIBIT 1_PAGE_080**

Dated: June 16, 2023

Respectfully submitted,

*/s/ Christopher Muha*
Christopher Muha
   Virginia Bar No. 89751
Matt Kaiser*
   D.C. Bar No. 486272
Amelia J. Schmidt*
   D.C. Bar No. 1012380
KAISERDILLON PLLC
1099 14th Street NW
8th Floor West
Washington, DC 20005
Telephone: 1 (202) 640-2850
Facsimile: 1 (202) 280-1034
**Pro hac vice* petition to be filed

*Counsel for Petitioner Ilan Shor*

16